[Cite as *State v. Jackson*, 2015-Ohio-5246.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

     Appellee

     v.

HARRY E. JACKSON
DANNIELLE L. HILEMAN
EUGENE B. HOOVER
DANIEL I. DEARMENT

     Appellants

C.A. Nos.    27132
                 27133
                 27158
                 27200

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 2012 03 0882 (A)
                CR 2012 03 0882 (C)
                CR 2012 03 0882 (D)
                CR 2012 03 0882 (E)

## DECISION AND JOURNAL ENTRY

Dated: December 16, 2015

---

CARR, Judge.

**{¶1}** Defendant-Appellants, Harry Jackson, Dannielle Hileman, Eugene Hoover, and Daniel DeArment (collectively "Appellants"), appeal from their convictions in the Summit County Court of Common Pleas. This Court affirms.

### I.

**{¶2}** Jackson is the owner of a store in Akron, Ohio, known as The Odd Corner. In March 2012, the University of Akron Police Department began investigating The Odd Corner because they suspected that illegal bath salts were being sold there. The department conducted a controlled buy at the store on March 21, 2012. Hoover, an employee of the store, was working that day and sold a product called Joy to one of the department's undercover detectives. Joy

comes in a small orange container and consists of a white powder that contains Pentedrone. At all times relevant to this appeal, Pentedrone was not yet listed as a controlled substance. It was the State's position that Pentedrone was an analog of Methcathinone, a schedule I controlled substance.

{¶3} After successfully purchasing Joy from The Odd Corner, the University of Akron Police Department secured a warrant to search the store. Its officers arrived on scene on the morning of March 23, 2012, to conduct additional surveillance and to execute the warrant. Hileman, the manager at The Odd Corner, was working that day and sold Joy to multiple customers while members of the police department watched. DeArment was one of the customers who purchased Joy. He and several others were stopped in their vehicles after leaving the store. Meanwhile, other members of the police department executed the warrant and found almost 100 containers of Joy in a back room of the store.

{¶4} A grand jury indicted Appellants on multiple counts of aggravated trafficking in Pentedrone and/or aggravated possession of Pentedrone. Jackson was also indicted on several counts of complicity to commit aggravated trafficking in Pentedrone. Appellants' indictments identified Pentedrone as a controlled substance analog whose chemical structure was substantially similar to Methcathinone, a schedule I controlled substance. Under R.C. 3719.013, controlled substance analogs are treated as schedule I controlled substances to the extent that the analogs are intended for human consumption.

{¶5} Jackson filed a motion to declare the controlled substance analog statute unconstitutional and the remaining Appellants joined in his motion. The trial court held a two-day hearing at which four experts testified: two experts for Appellants and two for the State. When the hearing concluded, the court took the matter under advisement. The court later denied

Appellants' motion by journal entry, finding the analog statute constitutional as applied and on its face.

{¶6} After the court rejected Appellants' challenge to the analog statute, Appellants filed a motion in limine. Appellants sought to preclude the State's two experts from testifying at trial on the basis that their testimony was scientifically unreliable. The State responded in opposition to Appellants' motion in limine. Additionally, the State asked the court to preclude Appellants' experts from testifying at trial on the basis that their testimony was scientifically unreliable and/or would confuse or mislead the jury. The court held a hearing on the motions in limine. Although the court denied Appellants' motion to exclude the State's experts, it granted the State's motion to exclude Appellants' experts. Consequently, Appellants' experts were not permitted to testify at trial.

{¶7} Appellants were all tried together before a jury, and the jury found them guilty on all counts. Both Jackson and Hileman were convicted of second-degree felonies because the jury found that they sold or possessed an amount of Pentedrone that was between five and 50 times the bulk amount. The court sentenced Jackson to four years in prison and a $25,000 fine. Hileman was sentenced to two years in prison, and Hoover and DeArment both received community control. Appellants then appealed from their respective convictions, and this Court consolidated the four appeals.

{¶8} Appellants collectively raise 21 assignments of error for our review. For ease of analysis, we consolidate and rearrange the assignments of error.

II.

### HILEMAN & HOOVER'S ASSIGNMENT OF ERROR I

THE OHIO CONTROLLED SUBSTANCE ANALOG STATUTE, AS
CODIFIED IN R.C. [3]719.013, IS UNCONSTITUTIONALLY VAGUE ON ITS

FACE AND AS APPLIED AS IT CONTAINS INSUFFICIENT ENFORCEMENT GUIDELINES AND FAILS TO PROVIDE ADEQUATE NOTICE OF THE TYPE OF CONDUCT PROHIBITED.

### JACKSON'S ASSIGNMENT OF ERROR I

THE OHIO CONTROLLED SUBSTANCE ANALOG STATUTE, AS CODIFIED IN R.C. [3]719.013, IS UNCONSTITUTIONALLY VAGUE ON ITS FACE AND AS APPLIED AS IT CONTAINS INSUFFICIENT ENFORCEMENT GUIDELINES AND FAILS TO PROVIDE ADEQUATE NOTICE OF THE TYPE OF CONDUCT PROHIBITED.

### DEARMENT'S ASSIGNMENT OF ERROR II

THE OHIO CONTROLLED SUBSTANCE ANALOG STATUTE, AS CODIFIED IN R.C. 3719.013, IS UNCONSTITUTIONALLY VAGUE ON ITS FACE AND AS APPLIED AS IT CONTAINS VAGUE ENFORCEMENT STANDARDS AND FAILS TO PROVIDE ADEQUATE NOTICE OF THE TYPE OF CONDUCT PROHIBITED.

{¶9} In each of the foregoing assignments of error, Appellants argue that the controlled substance analog statute, R.C. 3179.013, is unconstitutionally vague on its face and as applied to each of them. We do not agree that the statute is unconstitutionally vague as applied. Consequently, we do not address Appellants' argument that the statute is vague on its face.

{¶10} Legislative enactments are afforded a strong presumption of constitutionality. *State v. Collier*, 62 Ohio St.3d 267, 269 (1991). "[I]f at all possible, statutes must be construed in conformity with the Ohio and United States Constitutions." *Id.* A party asserting that a statute is unconstitutional must prove that the statute is unconstitutional beyond a reasonable doubt. *Id.*

{¶11} When asserting that a statute is unconstitutional because it is void for vagueness, the challenging party must show that, "after examining the statute, a person of ordinary intelligence would not be able to understand what he is required to do under the law." *State v. Schneider*, 9th Dist. Medina No. 06CA0072-M, 2007-Ohio-2553, ¶ 6, citing *State v. Anderson*, 57 Ohio St.3d 168, 171 (1991). This Court has previously stated:

> In considering a challenge to [a statute] as void for vagueness, a court is required to determine whether the statute (1) provides sufficient notice of its proscriptions to facilitate compliance by persons of ordinary intelligence and (2) is specific enough to prevent official arbitrariness or discrimination in its enforcement. A statute does not need to avoid all vagueness, and is not void for vagueness simply because it could have been worded more precisely or with additional certainty. Rather, the critical question in all cases is whether the law affords a reasonable individual of ordinary intelligence fair notice and sufficient definition and guidance to enable him to conform his conduct to the law.

(Internal citations and quotations omitted). *In re E.D.*, 194 Ohio App.3d 534, 2011-Ohio-4067, ¶ 9 (9th Dist.). "Due process requires that the terms of a criminal statute be reasonably clear and definite and that there be ascertainable standards of guilt on which citizens, courts, and the police may rely." *Akron v. Rowland*, 67 Ohio St.3d 374, 381 (1993).

{¶12} Former R.C. 3719.013 provides that "[a] controlled substance analog, to the extent intended for human consumption, shall be treated for purposes of any provision of the Revised Code as a controlled substance in schedule I." The phrase "controlled substance analog" means a substance (1) whose chemical structure "is substantially similar to the structure of a controlled substance in schedule I or II," and (2) about which one of the following is true:

> (i) The substance has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

> (ii) With respect to a particular person, that person represents or intends the substance to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

R.C. 3719.01(HH)(1). Methcathinone is a schedule I controlled substance. Former R.C. 3719.41(E)(4). During the time frame relevant to this appeal, Pentedrone was not yet listed as a controlled substance.[1] *Id.*

{¶13} The four experts who testified at the constitutionality hearing all agreed on the chemical structures of Pentedrone and Methcathinone. There is no dispute that the two structures are identical in all respects but one: Pentedrone contains one additional ethyl group. The ethyl group is comprised of two carbon atoms and three hydrogen atoms, all of which link to the existing Methcathinone structure at the same location. Accordingly, while the alkyl chain in Methcathinone ends in one carbon atom and three hydrogen atoms, Pentedrone's alkyl chain extends farther due to the addition of the two carbon and three hydrogen atoms at the end of the chain. The experts disagreed about the significance of the additional atoms in Pentedrone and whether they could draw any conclusions about Pentedrone based on the statutory definition of a controlled substance analog.

{¶14} Lindsay Reinhold, a forensic chemist for NMS Labs, testified as an expert for the defense. Reinhold testified that, from an objective standpoint, all chemists should be able to identify the chemical structure of a molecule. Reinhold also opined, however, that it is entirely subjective whether a given chemist would find two chemical structures substantially similar because the phrase "substantially similar" is not one that is defined by the field of chemistry. She testified that any opinion she gave as to substantial similarity would be entirely her own and that different chemists could interpret that standard in different ways. She offered four different examples of how a chemist might define "substantially similar" and testified that, in the example

---

[1] Substitute House Bill 334, which took effect on December 20, 2012, specifically named Pentedrone as a Schedule I controlled substance.

embodying the strictest definition she could envision, the chemical structures of Pentedrone and Methcathinone would not be considered substantially similar.

{¶15} Reinhold agreed that certain criteria could be adopted to help define substantial similarity, such as similarities or differences in the physical chemical properties of two chemical structures (e.g., their boiling points and melting points). She testified, however, that she would not be able to draw any scientific conclusions about the similarities between Pentedrone and Methcathinone if only provided with the dictionary definitions of the words "substantial" and "similar." Even so, she agreed that both Pentedrone and Methcathinone were substitute Cathinones and that Cathinone is a schedule I controlled substance that is commonly found in bath salts.

{¶16} Anna Tabor, a forensic scientist in the chemistry section at the Bureau of Criminal Investigation & Identification ("BCI"), testified for the State. Tabor testified that BCI established a committee to identify various analog drugs and that the committee had classified Pentedrone as a controlled substance analog. Tabor opined that the chemical structure of Pentedrone is substantially similar to Methcathinone because the addition of a single ethyl group is not enough of a distinction to make the two structures dissimilar. She testified that both drugs are substitute Cathinones and share the same Cathinone backbone. She explained that a chemical becomes dissimilar to another chemical when its structure "is changed enough to alter the chemical behavior of the molecule" (e.g., the breaking of the backbone of the chemical structure). She acknowledged that she could not quantify that standard because different atoms have different effects and certain minor atom substitutions could cause a substantial change in the behavior of a molecule. She testified, however, that her training and knowledge of chemistry allowed her to understand how atoms interact and that she could draw upon that training and

knowledge to make substantial similarity determinations. Because the lengthening of the alkyl chain of Methcathinone by a single ethyl group would not alter the chemical behavior of the molecule, Tabor was able to conclude that Pentedrone is substantially similar to Methcathinone.

{¶17} Dr. Alfred Staubus, an Emeritus faculty member at The Ohio State University College of Pharmacy and a Ph.D. in pharmaceutical chemistry, testified for the defense regarding Pentedrone's effect on the central nervous system. Dr. Staubus testified that drugs generally work by binding to receptor sites in the brain. He agreed that receptors are like locks and drugs are like keys, with both fitting together to produce a certain effect. He testified that even drugs that bind to the same receptor sites can cause distinct pharmacological effects, depending on their chemical composition. He offered morphine and codeine as an example. While codeine only has one more methyl group than morphine, it has about one-tenth the analgesic activity of morphine. Dr. Staubus testified that the addition of even one methyl or ethyl group can "dramatically change" the pharmacological effect of a molecule in some instances, but not in others.

{¶18} Dr. Staubus stated that he would not be able to offer an opinion on whether Pentedrone has a substantially similar effect on the central nervous system as Methcathinone if guided only by the standard of substantial similarity. He testified that it would be necessary to conduct animal studies to know how the pharmacological effects of Pentedrone compare with the effects of Methcathinone. He further testified that substantial similarity is a vague standard that lacks a basis in science. According to Dr. Staubus, scientists in pharmacology and toxicology often consider whether two compounds are "significantly similar," but only in the context of applying a quantitative method. He testified that, for any given study,

> [y]ou have to read the study to find out what the definition of significant level of
> similarity is. * * * [I]f we want to establish a law that says that something is

significantly similar or different, we can say * * * let's set the standard that the central nervous system effect of such and such has to be within three standard deviations of each other. That way you can establish whether something is or is not significantly significant at a certain level.

In Dr. Staubus' opinion, before one can determine similarity, there must be a known analytical method for correlating the effects of one drug to the effects of another. He offered several different examples of the tests one could perform that could then be used to establish a quantitative method for measuring similarity.

{¶19} Dr. John Wyman, the chief toxicologist at the Cuyahoga County Medical Examiner's Office, testified for the State regarding Pentedrone's effect on the central nervous system. Dr. Wyman testified that Methcathinone is a stimulant that works by binding to the dopamine, norepinephrine, and serotonin neurotransmitters in the brain and preventing their reuptake. Methcathinone has known pharmacological effects and Dr. Wyman listed those effects for the court. While Dr. Wyman testified that he was not aware of any studies about the pharmacological effects of Pentedrone, he testified that more information was known about Buphedrone.

{¶20} Dr. Wyman explained that Buphedrone is an analog of Methcathinone. Buphedrone shares Methcathinone's basic structure, but extends its alkyl chain by one additional carbon atom and three additional hydrogen atoms. Accordingly, Buphedrone has one less carbon atom than Pentedrone. Dr. Wyman testified that Buphedrone has been shown to bind to the same receptors as Methcathinone and has a similar list of pharmacological effects. The structural similarity between Buphedrone and Pentedrone caused Dr. Wyman to expect that Pentedrone would bind to the same receptor sites as Buphedrone and Methcathinone. Given the lack of formal studies about the pharmacological effects of Pentedrone, however, Dr. Wyman stated that he felt it would be beneficial to consult the internet. Therefore, he searched for "Pentedrone

experience" on the internet. He testified that he uncovered a great number of testimonials about Pentedrone, "which included descriptions of the effects of Pentedrone that mirrored the effects of Methcathinone and Buphedrone." It was Dr. Wyman's conclusion that Pentedrone is a structurally similar analog of Methcathinone and causes a "similar or increased pharmacology to that of Methcathinone."

{¶21} Appellants argue that the controlled substance analog statute is unconstitutionally vague because "[t]here is no universally accepted scientific approach to determine what constitutes substantial similarity in structure or its effects on the nervous system." They argue that the statute lends itself to arbitrary enforcement and would not have put a reasonable person on notice that the distribution or purchase of Pentedrone was illegal.

{¶22} Initially, we note that the vast majority of Appellants' argument concerns the statutory definition of "controlled substance analog," not the controlled substance analog statute itself. The controlled substance analog statute only provides for the treatment of a controlled substance analog as a schedule I controlled substance, to the extent that it is intended for human consumption. *See* R.C. 3719.013. R.C. 3719.01(H)(H) defines "controlled substance analog" and is the source of the substantial similarity language with which Appellants take issue. Accordingly, the constitutionality of the controlled analog statute largely depends upon the constitutionality of the definition of "controlled substance analog," as it is contained in R.C. 3719.01(H)(H).

{¶23} Ohio's statutory scheme with regard to controlled substance analogs is virtually identical to the Controlled Substance Analogue Enforcement Act of 1986 ("the Federal Act"). "Under the [Federal Act], 21 U.S.C. §§ 802(32)(A), 813 (2000), some substances that have not been listed as controlled substances, but that are sufficiently similar to a listed substance, are,

under certain additional circumstances, treated as Schedule I controlled substances for the purposes of federal drug law." *United States v. Roberts*, 363 F.3d 118, 120 (2d Cir.2004). To convict an offender under the Federal Act, the government must prove that

> (1) the alleged analogue substance has a chemical structure that is substantially similar to the chemical structure of a controlled substance classified under Schedule I or Schedule II (*the chemical structure element*); (2) the alleged analogue substance has an actual, intended or claimed stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than such effect produced by a Schedule I or Schedule II controlled substance (*the pharmacological similarity element*); and (3) the analogue substance is intended for human consumption (*the human consumption element*).

*United States v. McFadden*, 753 F.3d 432, 436 (4th Cir. 2014), *vacated on other grounds*, *McFadden v. United States*, 135 S.Ct. 2298 (2015). *Accord* 21 U.S.C. § 802(32)(A). "Congress enacted the [Federal] Act to prevent underground chemists from altering illegal drugs in order to create new drugs that are similar to their precursors in effect but are not subject to the restrictions imposed on controlled substances." *United States v. Klecker*, 348 F.3d 69, 70 (4th Cir.2003).

{¶24} Since 1986, numerous Circuit Courts have considered void for vagueness challenges to the Federal Act and have found it to be constitutional. *See, e.g., McFadden* at 438-441 (constitutional as applied to bath salts); *United States v. Turcotte*, 405 F.3d 515, 531-533 (7th Cir.2005) (constitutional as applied to Gamma Butyrolacetone); *United States v. Roberts*, 363 F.3d 118, 122-127 (2d Cir.2004) (constitutional as applied to 1,4-butanediol); *Klecker* at 71-72 (constitutional as applied to 5-methoxy-N,N-diisopropyltryptamine, a.k.a. "Foxy"); *United States v. Carlson*, 87 F.3d 440, 443-444 (11th Cir.1996) (constitutional as applied to 3,4-Methylenedioxymethamphetamine, a.k.a. MDMA); *United States v. Hofstatter*, 8 F.3d 316, 321-322 (6th Cir.1993) (constitutional as applied to various precursor chemicals that could be used to manufacture substances similar to methamphetamine); *United States v. Granberry*, 916 F.2d 1008 (5th Cir.1990) (constitutional on its face in case involving N-Hydroxy-3,4-

methylenedioxyamphetamine). Indeed, Appellants have failed to point to a single Circuit Court decision in which the Federal Act was found to be unconstitutional. The only federal case upon which Appellants rely in support of their argument is *United States v. Forbes*, 806 F.Supp. 232 (D.Colo.1992), a case from the Colorado District Court. Otherwise, they argue that the evidence introduced at the constitutionality hearing about Pentedrone was weaker than the evidence introduced about other drugs in several of the Circuit Court cases.

{¶25} In *United States v. Forbes*, a Colorado District Court judge found the Federal Act to be unconstitutionally vague as applied to alphaethyltryptamine ("AET"). AET was originally marketed as an anti-depressant in the early 1960s, but was removed from the market when it was linked to toxic side effects in some patients. Nevertheless, it was still available for purchase from two chemical manufacturers. The government charged Forbes with distribution of AET after he allegedly purchased it from a manufacturer for the purpose of distributing it. Because AET was never classified as a controlled substance, the government sought to establish it as an analog of either dimethyltryptamine ("DMT") or diethyltryptamine ("DET").

{¶26} Forbes filed a motion to dismiss, challenging the Federal Act as being unconstitutionally vague. At the hearing on his motion, there was a wide range of testimony about AET's structure and its effect. The defense experts testified that the chemical structure of AET was not substantially similar to DMT's or DET's chemical structures and that AET did not have a substantially similar effect on the central nervous system. One of the government's experts presented a contrary opinion, but another agreed that AET's chemical structure was not substantially similar to DMT's or DET's. There also was evidence that the government had previously declined to prosecute Forbes for the same behavior "due to the conflict within the government as to AET's structural similarity to DMT and DET." *Id.* at 234.

{¶27} The district court judge found troublesome the fact that there was no consensus among the scientific community, much less the government's own experts, about AET's structural similarity to DMT/DET or the methodology to be used in order to make that determination. *Id.* at 237. He noted that the chemical structure prong of the Federal Act did not appear to contain a scienter element so as to tailor its application. *Id.* at 238. Further, he noted that AET actually pre-existed DMT and DET and that Forbes was not one of the "underground chemists" that Congress sought to stop when it enacted the Federal Act. *Id.* The court found fault with the fact that the only change since the government's earlier decision not to prosecute Forbes for the same behavior was "the personalities of the government prosecutors and their hand-picked [] chemists." *Id.* at 239. The court concluded that the Federal Act, as it applied to AET, "provide[d] neither fair warning nor effective safeguards against arbitrary enforcement." *Id.* As such, it found the Federal Act unconstitutionally vague as applied to the "unique facts" at issue in the case. *Id.*

{¶28} This case differs from *Forbes* in several respects. First, the State did not present conflicting evidence about Pentedrone. Tabor testified that Pentedrone's chemical structure was substantially similar to the structure of Methcathinone and that a committee at BCI had identified Pentedrone as a controlled substance analog. Likewise, Dr. Wyman testified that Pentedrone was structurally similar to Methcathinone and would produce a similar or increased pharmacological effect. His testimony complimented Tabor's and vice versa. Their testimony also was never directly contradicted. That is, no one testified that the structure of Pentedrone was dissimilar to that of Methcathinone or that it would not produce a substantially similar effect. The defense experts only testified that they were unable to draw any scientific conclusions about Pentedrone, given that substantial similarity was an amorphous and

unscientific term. Accordingly, the type of expert testimony in this matter differed significantly from the type of expert testimony in *Forbes*.

{¶29} Second, unlike AET, there was no evidence that Pentedrone was ever available for purchase for a significant length of time without restriction or that it was ever marketed for a legitimate purpose. On the contrary, the drug was so new that no formal studies had yet been conducted on it to determine its effect. Moreover, there is no suggestion that any of Appellants were lulled into the same false sense of security as Forbes regarding their dealings with Pentedrone. The government's change of heart concerning whether to prosecute Forbes for the same behavior was a significant factor that the *Forbes* Court relied upon in concluding that the Federal Act was unconstitutional as applied. *See Forbes*, 806 F.Supp. at 237-239. The "unique facts" upon which the district court judge based his decision in *Forbes* are absent from the case at hand. *See id.* at 239.

{¶30} Finally, the analysis in *Forbes* regarding a lack of scienter in the definition of "controlled substance analogue" is unavailing. *See id.* at 238. The fact that the definitional portion of a statute does not contain a mens rea element does not mean that a defendant can be convicted in the absence of a culpable mental state. Several federal courts have looked to the intended for human consumption element of the Federal Act as an "intent requirement [that] tends to defeat any vagueness challenge based on the potential for arbitrary enforcement." *Klecker*, 348 F.3d at 71, citing *Carlson*, 87 F.3d at 444. The Ohio controlled substance analog statute contains the same element. *See* Former R.C. 3719.013. Moreover, the individual statutes that Appellants were alleged to have violated each contained a culpable mental state. Appellants could only be convicted if they *knowingly* possessed or trafficked in Pentedrone. *See* Former R.C. 2925.11(A)(C)(1) and 2925.03(A)(C)(1). *See also Roberts*, 363 F.3d at 123 (criticizing

defendants' argument that the Federal Act did not give them fair notice of proscribed behavior where the government had to prove that they knowingly or intentionally distributed a controlled substance). As such, *Forbes* is distinguishable from the case at hand and we are not persuaded that it has reasoned application here.

{¶31} The Twelfth District recently rejected a void for vagueness challenge to the definition of "controlled substance analog" and relied upon federal case law to do so. *See State v. Shalash*, 12th Dist. Warren No. CA2013-06-052, 2014-Ohio-2584, ¶ 26-33. We agree that the federal case law interpreting the Federal Act is instructive and constitutes persuasive authority in this matter. *See Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 31 (while not bound by it, Ohio courts "often look to federal court interpretation of federal statutes analogous to Ohio statutes"). Consequently, we consider the evidence introduced at the constitutionality hearing in conjunction with the federal case law.

{¶32} As previously noted, the first question a court must ask in performing a vagueness analysis is whether the statute at issue "provides sufficient notice of its proscriptions to facilitate compliance by persons of ordinary intelligence * * *." *In re E.D.*, 2011-Ohio-4067, at ¶ 9, quoting *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, ¶ 84. Both the Fourth and Sixth Circuits have rejected vagueness challenges to the Federal Act where there was evidence that the chemical diagrams of the alleged analog and controlled substance at issue had noticeable similarities and there was expert testimony that the two had substantially similar chemical structures. *See McFadden*, 753 F.3d at 439-440; *Hofstatter*, 8 F.3d at 320-322. The same evidence exists in this matter.

{¶33} Both the State and Appellants introduced two-dimensional diagrams of the chemical structures of Pentedrone and Methcathinone. There is no dispute that their chemical

structures are identical, except that Pentedrone has a longer alkyl chain. The State's witnesses testified that Pentedrone was structurally similar to Methcathinone because both share the Cathinone backbone, and Tabor explained that the lengthening of Methcathinone's alkyl chain by a single ethyl group would not be enough to alter the chemical behavior of the molecule. Both she and Dr. Wyman were able to use their training and knowledge of chemistry to conclude that Pentedrone is substantially similar to Methcathinone. *See United States v. Washam*, 312 F.3d 926, 931 (8th Cir.2002) ("[S]ome level of difference is acceptable between an analog[]'s chemical structure and a proscribed chemical's structure."). While there was testimony that the phrase "substantially similar" does not lend itself to a uniform definition, due process does not require "absolute certainty in every case in which a person seeks to experiment in reaching the outermost boundaries of lawful conduct." *United States v. Niemoeller*, S.D.Indiana No. IP 02-09-CR-1 H/F, 2003 WL 1563863, *4 (Jan. 24, 2003). *See also Perez v. Cleveland*, 78 Ohio St.3d 376, 378 (1997) ("The void-for-vagueness doctrine does not require statutes to be drafted with scientific precision."). So long as a reasonable person would have sufficient notice of a statute's prescriptions, it is not unconstitutionally vague. *See In re E.D.* at ¶ 9, quoting *Norwood* at ¶ 84. Here, "the similarities in [the] structures [of Pentedrone and Methcathinone] would put a reasonable person on notice that [Pentedrone] might be regarded as a [Methcathinone] analog[], particularly if that person intended * * * that [Pentedrone] be ingested as a [stimulant]." *Klecker*, 348 F.3d at 72.

{¶34} With respect to pharmacological similarity, Dr. Wyman opined that Pentedrone would have a substantially similar effect on the central nervous system as Methcathinone. He was unable to point to any formal studies about the effects of Pentedrone because there were none yet in existence. He did testify, however, that Pentedrone differed from Buphedrone by

only one atom and that Buphedrone has been shown to bind to the same receptors as Methcathinone and has a similar list of pharmacological effects. Both he and Tabor were able to rely upon their scientific knowledge and training to conclude that the lengthening of the alkyl chain of Methcathinone by a single ethyl group would not be enough to alter the chemical behavior of the molecule.

{¶35} The second question a court must consider in analyzing a vagueness challenge is whether the statute at issue "is specific enough to prevent official arbitrariness or discrimination in its enforcement." *In re E.D.* at ¶ 9, quoting *Norwood* at ¶ 84. To convict Appellants, the State would have to prove that they intended Pentedrone for human consumption and knowingly possessed or trafficked in it. *See* Former R.C. 3179.013 and 2925.11(A)(C)(1) and 2925.03(A)(C)(1). Both elements of proof tend to negate Appellants' argument that the controlled substance analog statute lends itself to arbitrary or discriminatory enforcement. *See State v. Barnhardt*, 9th Dist. Lorain No. 05CA008706, 2006-Ohio-4531, ¶ 12. *See also McFadden*, 753 F.3d at 441; *Roberts*, 363 F.3d at 123; *Klecker*, 348 F.3d at 71; *Hofstatter*, 8 F.3d 322. Moreover, "[a]rbitrary and discriminatory enforcement further is prevented by the additional statutory requirements that the government prove (1) substantial chemical similarity between the alleged analog[] substance and the controlled substance, and (2) actual, intended, or claimed pharmacological similarity of the alleged analog[] substance and the controlled substance." *McFadden* at 441.

{¶36} Although certain chemists might disagree as to the meaning of "substantially similar," we cannot conclude that a lack of consensus among experts renders the controlled substance analog statute unconstitutionally vague. When words in a statute are not defined, they are to be "construed according to the rules of grammar and common usage." R.C. 1.42.

"Similar" means "having characteristics in common" or "alike in substance or essentials." Merriam-Webster's Collegiate Dictionary 1161 (11th Ed.2004). Meanwhile, "substantial" is defined as "being largely but not wholly that which is specified." *Id.* at 1245. Both Tabor and Dr. Wyman were able to rely on the common meaning of the phrase "substantially similar," in conjunction with their knowledge and training, to conclude that Pentedrone is substantially similar to Methcathinone. Appellants have not shown that the State's case against them was the result of arbitrary or discriminatory enforcement.

{¶37} The federal courts have recognized the difficulty the legislature faces in drafting analog statutes, "[g]iven the creativity of amateur chemists." *Hofstatter*, 8 F.3d at 322. To be effective, controlled substance analog statutes must retain some degree of elasticity. Otherwise, "there is a genuine potential that the creation of such substances could outpace any efforts by authorities to identify and catalog them." *McFadden* at 441. Having reviewed the record and the relevant authority, we cannot conclude that Appellants have proven beyond a reasonable doubt that the analog statute is unconstitutionally vague as applied to them. *See State v. Collier*, 62 Ohio St.3d 267, 269 (1991). Consequently, the trial court did not err by finding the statute constitutional as applied. Because we have determined that the statute is constitutional as applied to Appellants, we need not consider whether it is unconstitutionally vague in all its applications. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).

{¶38} Before concluding, we note that each of Appellants' briefs contains a reference to two controlled substance analog cases from the Franklin County Court of Common Pleas. Appellants claim that the Franklin County Court dismissed the indictments in each case "because, until December 2012 when the Legislature created the offenses of dealing or

possessing analog substances in H.B. 334, the Legislature had not specifically defined selling or possessing an analog substance as a crime under R.C. Title 29 * * *." Hileman and Hoover's brief only mentions the foregoing cases in passing, but both Jackson and DeArment ask this Court to review the foregoing argument for plain error (acknowledging that they did not raise it in the court below). Neither, however, actually develops a plain error argument, and the issue they appear to be raising falls outside the scope of their stated assignments of error. As such, we decline to address it. *See State v. Miller*, 9th Dist. Summit No. 27048, 2015-Ohio-279, ¶ 18. Hileman and Hoover's first assignment of error, Jackson's first assignment of error, and DeArment's second assignment of error are overruled.

## DEARMENT'S ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED DEARMENT'S MOTION TO SUPPRESS THE FRUITS OF UNIVERSITY OF AKRON POLICE'S ILLEGAL STOP OF DEARMENT'S VEHICLE, AND DEARMENT'S UN-MIRANDIZED STATEMENTS TO UNIVERSITY OF AKRON POLICE.

{¶39} In his first assignment of error, DeArment argues that the trial court erred by denying his motion to suppress. Specifically, he argues that the police lacked reasonable suspicion to stop his vehicle and elicited incriminating statements from him in the absence of a *Miranda* warning. We do not agree that the trial court erred by denying DeArment's motion to suppress.

{¶40} The Ohio Supreme Court has held:

Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning*, 1 Ohio St.3d 19 (1982). Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court,

whether the facts satisfy the applicable legal standard. *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. *Accord State v. Hobbs*, 133 Ohio St.3d 43, 2012-Ohio-3886, ¶ 6 (*Burnside* applied). Accordingly, this Court reviews the trial court's factual findings for competent, credible evidence and considers the court's legal conclusions de novo. *State v. Conley*, 9th Dist. Lorain No. 08CA009454, 2009-Ohio-910, ¶ 6, citing *Burnside* at ¶ 8.

**Reasonable Suspicion**

{¶41} The Fourth Amendment to the United States Constitution and Section 14, Article 1 of the Ohio Constitution proscribe unreasonable searches and seizures. To justify an investigative stop, an officer must point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1999), quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968). This Court has repeatedly recognized that "[a]n officer may stop a vehicle to investigate a suspected violation of a traffic law." *State v. Slates*, 9th Dist. Medina No. 25019, 2011-Ohio-295, ¶ 23, quoting *Akron v. Tomko*, 9th Dist. No. 19253, 1999 WL 1037762, *2 (Nov. 3, 1999). "Where a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment * * * even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity." *Dayton v. Erickson*, 76 Ohio St.3d 3 (1996), syllabus.

{¶42} Detective Angela Paonessa testified that the University of Akron Police Department began investigating The Odd Corner after several individuals claimed to have purchased illegal bath salts there. Detective Paonessa participated in a controlled buy at the store during which she bought one container of Joy and witnessed several others buying Joy. She then

obtained a search warrant for the store and returned the following day to execute the warrant. Several members of the police department accompanied Detective Paonessa while others remained on standby in the vicinity of the store.

{¶43} Detective Paonessa testified that individuals began arriving and waiting in the parking lot of The Odd Corner approximately twenty minutes before the store was scheduled to open. She identified DeArment as one of the individuals she observed waiting. She testified that, when the store opened at about 11:15 a.m., DeArment entered the store with the others and was inside for approximately two minutes. After he exited the store, Detective Paonessa contacted one of the standby officers by radio and asked him to follow DeArment.

{¶44} Officer Lawrence Kouri testified that he began following DeArment, per Detective Paonessa's instructions. He followed DeArment onto Route 8 south and, later, onto 77 north. Officer Kouri testified that he observed DeArment execute an improper lane change near the Main Street exit. Specifically, he watched DeArment cut left across two lanes of travel to avoid exiting the highway. Officer Kouri testified that the highway was moderately busy at the time and that DeArment's improper lane change could have caused an accident. He testified that he stopped DeArment's vehicle based on the traffic violation he observed.

{¶45} DeArment argues that Officer Kouri lacked reasonable suspicion and/or probable cause to stop his vehicle. According to DeArment, when Officer Kouri later testified at trial, he admitted that Detective Paonessa had ordered him to stop DeArment, not just to follow him. Therefore, DeArment argues that Officer Kouri stopped his vehicle based on Detective Paonessa's orders, not the traffic violation he observed. He further argues that his mere presence at The Odd Corner on the morning the police planned to execute their warrant did not give rise to

reasonable suspicion to stop him. Consequently, he argues that Officer Kouri's traffic stop violated his Fourth Amendment rights.

{¶46} Initially, we note that DeArment never renewed his motion to suppress. The trial court ruled on his pre-trial motion to suppress based strictly on the testimony that Officer Kouri gave at the suppression hearing. DeArment never asked the court to reconsider its ruling on the basis that Officer Kouri's trial testimony differed from his testimony at the suppression hearing. This Court, therefore, must focus strictly on the evidence the trial court had before it when it ruled on DeArment's motion to suppress. *See State v. Gartrell*, 3d Dist. Marion No. 9-14-02, 2014-Ohio-5203, ¶ 68, fn.2.

{¶47} "Trial testimony * * * has no bearing upon a court's suppression ruling. Our review of a trial court's suppression ruling is limited to the testimony produced at the suppression hearing." *State v. Jackson*, 9th Dist. Summit No. 26234, 2012-Ohio-3785, ¶ 14. Accordingly, we reject DeArment's argument insofar as it depends upon Officer Kouri's trial testimony. At the suppression hearing, Officer Kouri testified that he stopped DeArment's vehicle because he observed DeArment make an improper lane change. DeArment has not argued that he did not, in fact, execute an improper lane change, and this Court has held that "[a]n officer may stop a vehicle to investigate a suspected violation of a traffic law." *Slates*, 2011-Ohio-295, at ¶ 23, quoting *Tomko*, 1999 WL 1037762, *2. Even if Officer Kouri had some ulterior motive for stopping DeArment, the traffic violation provided a constitutional basis for the stop. *See Erickson*, 76 Ohio St.3d 3, at syllabus. As such, the trial court did not err by rejecting DeArment's challenge to the stop of his vehicle.

**Custodial Interrogation**

{¶48} *Miranda* warnings are required only when an officer engages in custodial interrogation. *State v. Prunchak*, 9th Dist. Medina No. 04CA0070-M, 2005-Ohio-869, ¶ 26. "Custody" for purposes of entitlement to *Miranda* rights exists only where there is a "'restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983), quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "[A] traffic stop alone does not render the person in 'custody' within the meaning of *Miranda*." *State v. Strehl*, 9th Dist. Medina No. 10CA0063-M, 2012-Ohio-119, ¶ 10. More specifically, "an individual detained at a traffic stop is not in 'custody' for *Miranda* purposes until the individual has been formally arrested or subjected to a functional equivalent of a formal arrest." *Prunchak* at ¶ 27. *Accord State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, ¶ 13, citing *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). "Relevant inquiries are whether the suspect is free to leave the scene, the purpose, place and length of the questioning, and whether a reasonable person in the suspect's position would have considered himself to be in custody." *Akron v. Wilkerson*, 9th Dist. Summit No. 15434, 1992 WL 194183, *1 (Aug. 12, 1992).

{¶49} Officer Kouri testified that, after he stopped DeArment's vehicle, he approached and spoke with DeArment. He testified that it was his practice to ask drivers where they are coming from and that he asked DeArment the same question. DeArment responded that he was coming from The Odd Corner. Officer Kouri then asked if DeArment had bought anything there, and DeArment indicated that he had. When Officer Kouri asked DeArment what he had bought at the store, DeArment told him that he had purchased Joy and indicated that it was in the driver's sleeve door. Officer Kouri estimated that the entire exchange lasted approximately 30 to 40 seconds. He testified that he never placed DeArment in handcuffs or arrested him.

Approximately ten minutes after their conversation, a detective arrived on scene, questioned DeArment, and ultimately decided to arrest him. Officer Kouri testified that the detective arrived before he had finished processing the traffic violation that he had observed.

{¶50} DeArment argues that the trial court should have suppressed the statements that he made to Officer Kouri because he was in custody at the time Officer Kouri questioned him and Officer Kouri failed to Mirandize him. Yet, "a traffic stop alone does not render [a] person in 'custody' within the meaning of *Miranda*." *Strehl*, 2012-Ohio-119, at ¶ 10. For DeArment to have been in custody, he must have been "formally arrested or subjected to a functional equivalent of a formal arrest." *Prunchak* at ¶ 27. DeArment has failed to point to any facts beyond the traffic stop itself in support of his custody argument. *See* App.R. 16(A)(7). The record reflects that Officer Kouri briefly questioned DeArment for approximately 30 to 40 seconds and that he did so immediately after stopping him. Officer Kouri did not remove DeArment from his vehicle, indicate that he was under arrest, or place him in handcuffs or his police cruiser before questioning him. Even if Officer Kouri's questions were designed to elicit an incriminating response, *Miranda* only applies if a suspect is subjected to custodial interrogation. *State v. Simin*, 9th Dist. Summit No. 26016, 2012-Ohio-4389, ¶ 14. DeArment has not demonstrated that he was in custody at the time that he answered Officer Kouri's questions. *See id.* at ¶ 15. *See also Cuyahoga Falls v. Stephenson*, 9th Dist. Summit No. 18011, 1997 WL 379896, *3 (June 18, 1997); *State v. Bandy*, 9th Dist. Summit No. 13431, 1988 WL 57531, *2 (June 1, 1988). As such, the trial court did not err by denying his motion to suppress. DeArment's first assignment of error is overruled.

**HILEMAN & HOOVER'S ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED IN PERMITTING DR. TABOR AND DR. WYMAN TO TESTIFY ON BEHALF OF THE PROSECUTION BECAUSE THEIR TESTIMONY WAS BASED ON UNRELIABLE SCIENTIFIC THEORIES AND METHODS, IN VIOLATION OF OHIO EVID. R. 702.

**JACKSON'S ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED IN PERMITTING DR. WYMAN AND ANNA TABOR TO TESTIFY BECAUSE THEIR TESTIMONY WAS BASED ON UNRELIABLE METHODS, IN VIOLATION OF OHIO EVID.R. 702.

**DEARMENT'S ASSIGNMENT OF ERROR III**

THE TRIAL COURT ERRED IN PERMITTING DR. TABOR AND DR. WYMAN TO TESTIFY ON BEHALF OF THE PROSECUTION BECAUSE THEIR TESTIMONY WAS BASED ON UNRELIABLE SCIENTIFIC THEORIES AND METHODS, IN VIOLATION OF OHIO EVID.R. 702.

**{¶51}** In each of the foregoing assignments of error, Appellants argue that the trial court abused its discretion by allowing two of the State's expert witnesses to testify at trial. Specifically, they argue that the court should have excluded the testimony of Tabor and Dr. Wyman because it was not scientifically reliable. We do not agree that the court abused its discretion by admitting their testimony.

**{¶52}** Evid.R. 702 governs the admissibility of expert testimony in Ohio. The rule permits a witness to testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; [and]

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.[2]

Evid.R. 702. This appeal only concerns subdivision (C)'s reliability requirement, which is distinct from the rule's qualification requirements. *See Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 17. "Because even a qualified expert is capable of rendering scientifically unreliable testimony, it is imperative for a trial court, as gatekeeper, to examine the principles and methodology that underlie an expert's opinion." *Id.*

{¶53} "In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611 (1998), citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-594 (1993). Nevertheless, the foregoing "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "[T]he test of reliability is 'flexible,'" *id.*, and "the trial court may, at its discretion, consider the [] factors to the extent relevant." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 118. The Ohio Supreme Court has cautioned that "the reliability requirement * * * should not be used to exclude all evidence of questionable reliability * * *." *Miller* at 614. The ultimate focus must be "on whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial." *Id.* at paragraph one of the syllabus.

---

[2] Subdivision (C) contains additional reliability requirements "[t]o the extent that the testimony reports the result of a procedure, test, or experiment * * *."

{¶54} "[A] trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd.* at 152. Consequently, "[t]he determination of the admissibility of expert testimony is within the discretion of the trial court." *Valentine* at ¶ 9. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

**Anna Tabor**

{¶55} Tabor, a forensic scientist in BCI's chemistry section, testified that she was asked to test certain evidence in this case for the presence or absence of controlled substances. To do so, Tabor tested small samples of the evidence using a gas chromatograph/mass spectrometer and a gas chromatograph flame ionization detector. She confirmed that the procedures she employed to analyze the samples were commonly used in the field of forensic chemistry. She also confirmed that the instruments she used had been calibrated properly and did not malfunction when she performed her tests.

{¶56} Tabor testified that the gas chromatograph/mass spectrometer was unable to identify all of the components of the sample she tested, but that it did identify three: Pentedrone, acetaminophen, and caffeine. She explained that she then took another sample of the evidence and used the gas chromatograph flame ionization detector to confirm the presence of Pentedrone. After the ionization detector confirmed the presence of Pentedrone, Tabor testified that she then had to determine whether Pentedrone was a controlled substance. To do so, she consulted an analog list generated by a chemistry committee at BCI. Tabor testified that the list was available

on BCI's server and was comprised of numerous substances that BCI had determined were substantially similar to particular controlled substances.

{¶57} Tabor testified that BCI's analog list contained an entry for Pentedrone and informed her that its chemical structure was substantially similar to the chemical structure of Methcathinone. Accordingly, she personally compared the chemical structures of the two molecules using two-dimensional models. She testified that the only difference between the two molecules was the addition of an ethyl group consisting of two carbon and five hydrogen atoms. Tabor stated that the ethyl group was a neutral addition to the molecule. She testified that her education and training allowed her to conclude that the two structures were substantially similar. While Tabor acknowledged that the phrase "substantially similar" was not a scientific term of art, she testified that BCI relied upon the common meaning of the phrase to make its analog determinations.

{¶58} Because Tabor did not serve on the chemistry committee responsible for generating BCI's analog list, the State also called Jennifer Acurio to testify at the motion in limine hearing. Acurio testified that she was also a forensic chemist at BCI and had almost 19 years of experience working at BCI and another forensic science laboratory in Chicago. She explained that, after the analog law went into effect in October 2011, the chemists at BCI decided to form a committee to help identify analogs. The goal of the committee was to compile a master list that all of BCI's laboratories could rely upon to achieve consistency in their determinations. The committee consisted of five chemists and three supervisors who also were scientists. Acurio served on the committee.

{¶59} Acurio explained the process of how a given compound would be added to BCI's list and, therefore, be considered substantially similar to a particular controlled substance. She

testified that each member of the committee would compare the chemical structure of a given compound with that of a known controlled substance using two-dimensional models. The committee would then report its results to all of the other forensic chemists at BCI and ask them to review the two structures for substantial similarity. The committee did so regardless of the outcome of their initial review so that the other chemists would have the opportunity to agree or disagree with their findings. Acurio testified that there were 12 other forensic chemists at BCI and the committee would only add a compound to the analog list if both the committee members and the other forensic chemists unanimously agreed that the chemical structures at issue were substantially similar.

{¶60} Acurio testified that she believed the process BCI used to identify analogs was a commonly accepted process in the scientific community and similar to the process the Drug Enforcement Agency ("DEA") employed. She testified that BCI scientists used the standard dictionary definitions of "substantially" and "similar" to evaluate compounds, but also were guided by three criteria that came from a DEA presentation on structural similarity. Acurio explained that, in applying those criteria, a BCI chemist would: (1) look to see if the core structure of a controlled substance was present in the new compound under examination; (2) ensure that the core structure constituted a substantial portion of the new compound; and (3) examine the functional groups on the new compound (e.g., an ethyl group) to ensure that they were similar to the functional groups of the controlled substance. She testified that the addition of the ethyl group in Pentedrone constituted "a small addition to the [Methcathinone] molecule" and that she could rely on her knowledge of chemistry to conclude that the addition would not have a significant impact on the core structure of the molecule.

{¶61} Appellants argue that the court erred by allowing Tabor to testify because her testimony failed to satisfy Evid.R. 702(C)'s admissibility requirement. They argue that Tabor's testimony was scientifically unreliable because "[n]o evidence was presented that [] BCI's method of analyzing a two-dimensional diagram of the molecules and applying a dictionary definition of 'substantially similar'" meets the four criteria outlined in *Daubert* and adopted by the Ohio Supreme Court in *Miller*. *See Miller*, 80 Ohio St.3d at 611, citing *Daubert*, 509 U.S. at 593-594.

{¶62} As previously noted, the test of scientific reliability is a flexible one, and the factors outlined in *Daubert* "neither necessarily nor exclusively appl[ly] to all experts or in every case." *Kumho Tire Co., Ltd.*, 526 U.S. at 141. A trial court must ensure that an expert's opinion is based on scientifically valid principles, but it has "considerable leeway" in determining how to measure reliability. *Id.* at 152. "[E]ven if [an expert's] opinion has neither gained general acceptance by the scientific community nor has been the subject of peer review, these are not prerequisites to admissibility under *Daubert* * * *. Rather, they are just factors for a court to consider in determining reliability." (Internal citations omitted.) *Miller* at 613.

{¶63} The trial court determined that Tabor's testimony was based on established scientific principles. The court noted that Tabor had used scientifically accepted methods and instruments to test the actual samples in this case. Further, it noted that there was testimony to support the conclusion that a side-by-side comparison of two molecules using two-dimensional models was a generally accepted method in the field of chemistry for the comparison of molecules. The court found that Acurio's testimony strengthened the State's position because it showed that substantial similarity determinations at BCI, while not published outside the

institution, were subject to internal peer review. Consequently, it concluded that Tabor's testimony was scientifically reliable.

{¶64} Having reviewed the record, we cannot conclude that the trial court abused its discretion by admitting Tabor's testimony. Tabor relied upon her scientific knowledge and training to test the actual samples in this case using scientifically established methods and equipment. She also relied upon her scientific knowledge to compare the chemical structures of Pentedrone and Methcathinone. Although Appellants argued that three-dimensional models are more accurate than two-dimensional models, both Tabor and Acurio testified that the use of two-dimensional models for visual comparison is a generally accepted method in the scientific community. They also testified that the use of three-dimensional models here would not have impacted their conclusion that Pentedrone's structure was substantially similar to Methcathinone's structure.

{¶65} To conclude that Pentedrone was substantially similar to Methcathinone, Tabor relied upon her education and training, in conjunction with an analog list that BCI had produced. There is no dispute that the list has not been published outside of BCI. There was testimony, however, about the internal method by which all of BCI's forensic chemists and committee members had to unanimously agree to the structural similarity of a compound before it was placed on the list. There also was testimony that the chemists at BCI used criteria from the DEA in making their substantial similarity determinations. Both Acurio and Tabor were able to rely on their knowledge of chemistry to conclude that the additional ethyl group in Pentedrone would not result in a substantial change to the Methcathinone molecule. *See United States v. Brown*, 415 F.3d 1257, 1267-1268 (11th Cir.2005) (court did not abuse its discretion in qualifying expert who made substantial similarity determination based on visual assessment of two-dimensional

models in conjunction with his expert knowledge of chemistry). *See also McFadden*, 753 F.3d at 439-440 (expert testified to substantial similarity based on his comparison of two-dimensional diagrams and his expert knowledge of chemistry). To the extent Appellants found fault with Tabor's testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert* at 596. The trial court's decision to admit her testimony was not unreasonable, arbitrary, or unconscionable. *See Blakemore*, 5 Ohio St.3d at 219. Insofar as they relate to Tabor, Appellants' assignments of error lack merit.

**Dr. John Wyman**

{¶66} Dr. Wyman identified himself as the chief toxicologist for the Cuyahoga County Medical Examiner's Office. Dr. Wyman, who holds a Ph.D. in comparative pharmacology and toxicology, explained that pharmacology and toxicology are the studies of either the beneficial effects (pharmacology) or the adverse effects (toxicology) that chemicals have on living systems. When identifying the effects that a new molecule might have as compared to the effects of a known molecule, Dr. Wyman testified that pharmacologists first compare the chemical structures of the two molecules, noting the extent of their differences and similarities. Using commonly accepted principles of chemistry and pharmacology, pharmacologists then predict the expected pharmacological effects the new molecule might have based on (1) the known effects of the similar molecule, and (2) the typical effects of the elements added to or subtracted from the similar molecule to create the new molecule. Finally, to validate their predictions, pharmacologists look to pharmacological studies that others have already conducted on the new molecule or conduct their own studies to fully understand the effects of the molecule on the body.

**{¶67}** In seeking to draw a conclusion about the pharmacological effect of Pentedrone, Dr. Wyman first reviewed and compared the two-dimensional chemical structures of Pentedrone and Methcathinone. He testified that the two molecules were 86 percent identical on the basis of molar mass and that one creates Pentedrone by adding an additional ethyl group to the existing Methcathinone structure.[3] Dr. Wyman testified that Methcathinone is a member of the Cathinone family, and that Cathinones have known pharmacological effects. He stated that peer-reviewed scientific articles exist about the pharmacological effects of Cathinones and that those effects are commonly accepted in the field of pharmacology. Further, he stated that it is commonly accepted in the fields of pharmacology and toxicology that Methcathinone causes pharmacological effects similar to the known effects of Cathinones.

**{¶68}** Dr. Wyman noted that, in addition to comparing Pentedrone's structure to Methcathinone's structure, he also considered another closely-related molecule named Buphedrone. He testified that one creates Buphedrone by adding one carbon atom to Methcathinone's structure at the same location where one adds atoms to create Pentedrone. Whereas one adds two carbon atoms to that location to create Pentedrone, one only adds one carbon atom to that same location to create Buphedrone. Thus, Buphedrone and Pentedrone differ by only one carbon atom. Dr. Wyman testified that Buphedrone is pharmacologically active and has been documented as causing pharmacological effects similar to Methcathinone and Cathinones in general. With that in mind, he considered what would be the effect of adding an additional carbon atom to the existing Buphedrone structure, thereby creating Pentedrone.

**{¶69}** Dr. Wyman explained that increasing the length of an alkyl chain through the addition of a carbon atom increases the solubility of the molecule in fat. He further explained

---

[3] As previously noted, an ethyl group consists of two carbon and three hydrogen atoms.

that the greater fat solubility a molecule has, the greater its ability to be absorbed into the body. Dr. Wyman opined that such a change would also increase the binding affinity of the drug, giving it the ability to form a stronger bond with receptors in the body and cause a similar or greater effect than its parent molecule. By way of example, he testified that heroin, while structurally similar to morphine, travels more quickly to the brain due to the fact that the heroin molecule has greater fat solubility. Because Pentedrone is created by adding carbon atoms and lengthening Methcathinone's alkyl chain, Dr. Wyman concluded that Pentedrone's additional ethyl group would increase its binding affinity and produce pharmacological effects that were either similar to or greater than Methcathinone. He confirmed that the general principle that increased fat solubility increases binding affinity is a commonly accepted principle in his field. In reaching his conclusion about Pentedrone's fat solubility and binding affinity, Dr. Wyman testified that he relied upon commonly accepted principles of chemistry, pharmacology, and toxicology.

{¶70} Dr. Wyman testified that no pharmacological studies were available on Pentedrone because it was a relatively new molecule and such studies take a significant period of time to perform. He testified, however, that he was able to apply the body of studies about Cathinones, Methcathinone, and Buphedrone to Pentedrone, in conjunction with his personal comparison of their structures and his knowledge and training in chemistry, pharmacology, and toxicology. Dr. Wyman testified that, while there are always exceptions to the general rule about how molecules will behave in the body, structurally similar molecules generally bind to the same receptor sites in the body and cause similar effects. At the motion in limine hearing, he testified that he could only think of about ten examples where the general rule did not hold true. He explained that relevant considerations in his comparison of Pentedrone and Methcathinone

included the size of the functional group present in Pentedrone in relation to the molar mass of the entire molecule, the type of functional group at issue (i.e., that it was an ethyl group rather than a reactive group), and the fact that the core structure of the Methcathinone molecule had not been altered.

**{¶71}** Because no pharmacological studies about Pentedrone were available, Dr. Wyman testified that he consulted the internet in the hopes of confirming his opinion about the pharmacological effects of Pentedrone. He testified that he found a wealth of information in the form of testimonials, describing the effects of Pentedrone after ingestion. Dr. Wyman conceded that information found on the internet is inherently suspect, but noted that many of the testimonials he read employed technical language that he associated with scientifically trained individuals. He testified that, given the wealth of testimonials he viewed and the uniformity of their descriptions about the effects of Pentedrone, the testimonials had "to be given some credence."

**{¶72}** Dr. Wyman ultimately concluded that, in his opinion, Pentedrone would have a substantially similar effect on the central nervous system as Methcathinone. He conceded that his opinion would not be considered scientifically reliable if viewed through the lens of the scientific method because no formal studies had yet been performed on Pentedrone and he could not validate his conclusions through testing. Nevertheless, Dr. Wyman expressed confidence in his opinion about Pentedrone due to its foundations in accepted science. He reiterated that, in reaching his conclusion, he relied upon: (1) commonly accepted principles of chemistry, pharmacology, and toxicology; (2) the commonly accepted method of comparing the structural relationships of two molecules through two-dimensional representations; (3) commonly accepted principles about the effects of an ethyl group; (4) peer-reviewed, commonly accepted

pharmacological studies about the effects of Cathinones; and (5) the commonly accepted pharmacological effects of Methcathinone and Buphedrone. He also rejected the notion that the lack of an exact scientific definition for "substantially similar" impeded his ability to analyze and form conclusions about Pentedrone. Indeed, Dr. Wyman testified that the analog statute would be unworkable if it contained a more specific definition because, as soon as an exact definition existed, a chemist would create an exception to the definition. To reach his conclusion, he indicated that he employed the everyday meaning of the words "substantially" and "similar."

{¶73} Appellants argue that the court erred by allowing Dr. Wyman to testify because his testimony failed to satisfy Evid.R. 702(C)'s admissibility requirement. They argue that Dr. Wyman's testimony was scientifically unreliable because he could only make predictions about Pentedrone's effect on the central nervous system. They note that Dr. Wyman could not validate his predictions through testing and no peer-reviewed studies or data on the effects of Pentedrone exist. According to Appellants, Dr. Wyman admitted that his own testimony was scientifically unreliable and further admitted that, in certain instances, very small changes in molecules could cause a great difference in their pharmacological effects. Finally, Appellants criticize Dr. Wyman for relying on the internet in conducting his analysis.

{¶74} We once again note that the test of scientific reliability is a flexible one, and the factors outlined in *Daubert* "neither necessarily nor exclusively appl[ly] to all experts or in every case." *Kumho Tire Co., Ltd.*, 526 U.S. at 141. A trial court must ensure that an expert's opinion is based on scientifically valid principles, but it has "considerable leeway" in determining how to measure reliability. *Id.* at 152. "[E]ven if [an expert's] opinion has neither gained general acceptance by the scientific community nor has been the subject of peer review, these are not

prerequisites to admissibility under *Daubert* * * *. Rather, they are just factors for a court to consider in determining reliability." (Internal citations omitted.) *Miller*, 80 Ohio St.3d at 613.

**{¶75}** The trial court acknowledged that Dr. Wyman's opinion had not been peer-reviewed and that little, if any, scientific research had been done on Pentedrone as of the date of the hearing. Because pharmacological studies simply cannot keep pace with designer drugs, however, the court noted that there had to be "a certain element of practicality" involved when deciding whether to admit testimony about designer drugs. The court noted that generally accepted scientific principles provided the foundation for Dr. Wyman's testimony. It further noted that none of the factors set forth in *Daubert* are dispositive when determining scientific reliability. The court indicated that it had considered the reliability factors and relevant case law and was satisfied that Dr. Wyman's opinion was scientifically reliable. Consequently, the court allowed his testimony.

**{¶76}** We are mindful that the admission of expert testimony is a matter that rests squarely within the trial court's sound discretion. *See Kumho Tire Co., Ltd.*, 526 U.S. at 152. Having reviewed the record, we cannot conclude that the trial court abused its discretion by admitting Dr. Wyman's testimony. Dr. Wyman readily agreed that his opinion did not conform to the traditional scientific method and that it currently could not be validated due to the lack of pharmacologic studies on Pentedrone. Yet, neither *Daubert*, nor Evid.R. 702(C) requires application of the scientific method as a prerequisite to admissibility. The key inquiry is "whether the [expert's] opinion is based upon scientifically valid principles * * *." *Id.* at paragraph one of the syllabus. Dr. Wyman testified that he was "absolutely confident" in the conclusion that he had drawn because it sounded in accepted scientific principles. *See State v. Nemeth*, 82 Ohio St.3d 202, 211 (1998) ("Relevant evidence based on valid principles will

satisfy the threshold reliability standard for the admission of expert testimony."). He testified that he applied his education and training in commonly accepted principles of chemistry and pharmacology to compare the structural relationship of Pentedrone and Methcathinone and drew his conclusion based upon the minor difference in their structures, commonly accepted principles about the effects of an ethyl group, and the commonly accepted pharmacological effects of Cathinones, Methcathinone, and Buphedrone. *See Valentine*, 110 Ohio St.3d 42, 2006-Ohio-3561, at ¶ 18 (scientists "may draw inferences from a body of work" so long as "any such extrapolation accords with scientific principles and methods"). To the extent he acknowledged that there are times when small changes to a molecule can dramatically change its pharmacological effect, he specifically opined that the additional ethyl group in Pentedrone would merely increase the fat solubility of the molecule. Thus, the trial court properly could have determined that the issue was one of sufficiency or weight rather than admissibility. *See, e.g.*, *State v. Poole*, 9th Dist. Medina No. 2336-M, 1995 WL 338477, *6 (June 7, 1995).

**{¶77}** Finally, this Court must consider Appellants' argument that Dr. Wyman's testimony was scientifically unreliable because it was based, in large part, on unverified internet testimonials. Initially, we note that Appellants have only presented us with the foregoing argument in the context of the trial court's discretionary decision to permit Dr. Wyman to testify. Appellants have not argued that the court erred by admitting the internet evidence at trial. Indeed, the record reflects that Appellants did not object to the admissibility of that testimony when it was presented at trial. Their sole argument is that the court abused its discretion by allowing Dr. Wyman to testify. Accordingly, we must confine our analysis to that specific issue.

**{¶78}** This Court is troubled by the notion that internet testimonials of unknown origin could serve as a reliable reference source for an expert seeking to form an opinion based on

scientifically valid principles. Under the facts of this case, however, Dr. Wyman testified that he consulted the internet strictly in the hopes of verifying the conclusion that he had already formed. He testified that he was "absolutely confident" in his conclusion because it was grounded in (1) commonly accepted principles of chemistry, pharmacology, and toxicology; (2) the commonly accepted method of comparing the structural relationships of two molecules through two-dimensional representations; (3) commonly accepted principles about the effects of an ethyl group; (4) peer-reviewed, commonly accepted pharmacological studies about the effects of Cathinones; and (5) the commonly accepted pharmacological effects of Methcathinone, and Buphedrone. Thus, scientifically valid principles formed the basis for his conclusion. Having carefully reviewed the record, we cannot conclude that the trial court's decision to allow Dr. Wyman to testify as an expert was unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

{¶79} To the extent Appellants found fault with Dr. Wyman's testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Appellants have not shown that the trial court went so far as to abuse its discretion in admitting his testimony. Accordingly, insofar as they relate to Dr. Wyman, Appellants' assignments of error lack merit. Hileman and Hoover's second assignment of error, Jackson's second assignment of error, and DeArment's third assignment of error are overruled.

### HILEMAN & HOOVER'S ASSIGNMENT OF ERROR III

THE TRIAL COURT VIOLATED APPELLANTS HILEMAN'S AND HOOVER'S RIGHTS TO A FAIR TRIAL AND TO DUE PROCESS WHEN IT PROHIBITED THE DEFENSE FROM CALLING THEIR PROFFERED EXPERT WITNESSES.

**JACKSON'S ASSIGNMENT OF ERROR IV**

THE TRIAL COURT VIOLATED JACKSON'S RIGHTS TO A FAIR TRIAL AND TO DUE PROCESS WHEN HE WAS PROHIBITED FROM CALLING PROFFERED EXPERT WITNESSES.

**DEARMENT'S ASSIGNMENT OF ERROR IV**

THE TRIAL COURT VIOLATED DEARMENT'S RIGHTS TO A FAIR TRIAL AND TO DUE PROCESS WHEN IT PROHIBITED DEARMENT AND HIS CO-DEFENDANTS FROM CALLING THEIR PROFFERED EXPERT WITNESSES.

**{¶80}** In each of the foregoing assignments of error, Appellants argue that the court erred when it refused to allow them to present expert testimony at trial. Specifically, they argue that the trial court, by not permitting Lindsay Reinhold and Dr. Alfred Staubus to testify, violated their Sixth Amendment right to present evidence in their own defense. We do not agree.

**{¶81}** "Due process requires [] 'that criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 46, quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984). It is the right of any criminal defendant "to offer testimony of witnesses on his behalf." *State v. Barrios*, 9th Dist. Lorain No. 06CA009065, 2007-Ohio-7025, ¶ 18, quoting *State v. Moon*, 74 Ohio App.3d 162, 169 (9th Dist.1991). *Accord* Sixth Amendment to the U.S. Constitution. Yet, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). "The determination of the admissibility of expert testimony is within the discretion of the trial court[, and] * * * [s]uch decisions will not be disturbed absent abuse of discretion." *Valentine*, 110 Ohio St.3d 42, 2006-Ohio-3561, at ¶ 9. An abuse of discretion is more than an error of

judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore*, 5 Ohio St.3d at 219. When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons*, 66 Ohio St.3d at 621.

{¶82} As previously noted, Evid.R. 702 permits a witness to testify as an expert if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; [and]

> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information * * *.

"[E]xpert testimony must assist the trier of fact in determining a fact issue or understanding the evidence." *Miller*, 80 Ohio St.3d at 611. "[W]ith regard to reliability, helpfulness turns on whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results." (Alteration sic) (Internal quotations and citations omitted.) *Id.* at 614. Moreover, "[e]ven when its relevance is shown through a proper foundation, a court must carefully weigh whether the expert testimony violates Evid.R. 403(A) * * *." *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, ¶ 54. The rule provides that evidence "[a]lthough relevant, * * * is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶83} By agreement of the parties, the trial court did not rule on the State's motion to exclude Appellants' experts until the first day of trial. The parties stipulated that the court would base its admissibility decision on the testimony that Reinhold and Dr. Staubus gave at the constitutionality hearing. Thus, if allowed, the two experts would testify that "substantially

similar" could be defined any number of ways and, due to the lack of a concrete definition, they were unable to form an opinion as to whether Pentedrone had either a substantially similar chemical structure or a substantially similar effect on the central nervous system as Methcathinone. Appellants argued that their experts' testimony would aid the jury because it would cast doubt on the ability of the State's experts to draw any conclusions about Pentedrone and the ability of ordinary people to know that Pentedrone was an illegal substance.

{¶84} The State opposed Reinhold's and Dr. Staubus' testimony on the basis that it did not meet Evid.R. 702's admissibility requirements. The State argued that the testimony was scientifically unreliable because the experts did not intend to testify about any methodology, technique, or principle that would link their expertise to the specific facts of the case. In fact, the crux of their testimony was that they could not form any opinion about the categorization of Pentedrone as an analog (i.e., that it was or was not substantially similar to Methcathinone). The State also urged that their testimony, if allowed, would suggest to the jurors that they, as lay people, should not be able to reach a conclusion about an analog when learned scientists could not.

{¶85} After hearing arguments from both parties, the trial court excluded Reinhold's and Dr. Staubus' testimony. The court agreed with the State's position that their testimony did not meet Evid.R. 702's admissibility requirements. Additionally, the court rejected Appellants' argument that the testimony would be helpful to the jury. The court noted that, while certain scientists in the field might be troubled by the prospect of applying the "substantially similar" standard, the reality of the situation was that the jury would have to follow the court's instructions and apply the common meaning of the phrase. Consequently, the court granted the State's motion to exclude the testimony.

{¶86} Appellants argue that the trial court violated their due process rights by excluding the testimony of Reinhold and Dr. Staubus. They argue that both experts were highly qualified and that their testimony "would have dispelled the misconceptions created by the State's witnesses." Specifically, both would have stressed the lack of consensus in the field about how to apply the phrase "substantially similar" in the absence of a scientific definition. In doing so, Appellants argue, both experts would have brought into question the ability of the State's experts to draw any conclusions about the classification of Pentedrone as a controlled substance analog.

{¶87} While a defendant has a constitutional right to introduce relevant evidence in his defense, the right is qualified in nature. *See Scheffer*, 523 U.S. at 308. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor*, 484 U.S. at 410. Accordingly, so long as the trial court properly found Reinhold's and Dr. Staubus' testimony inadmissible under the evidentiary rules, the court did not offend Appellants' rights to a fair trial by excluding their testimony. *See id.*

{¶88} For expert testimony to be admissible, it "must assist the trier of fact in determining a fact issue or understanding the evidence." *Miller*, 80 Ohio St.3d at 611. Additionally, it must not run afoul of Evid.R. 403(A) by being overly confusing or misleading. *See Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, at ¶ 54. The trial court found that Reinhold's and Dr. Staubus' testimony failed in both respects. Having reviewed the record, we must conclude that the court acted within its sound discretion when it excluded their testimony. That is because, even assuming that their testimony satisfied the strictures of Evid.R. 702, the record supports the conclusion that it would have been overly confusing or misleading to the jury.

{¶89} The parties stipulated that the trial court would base its admissibility determination on the testimony that Reinhold and Dr. Staubus gave at the constitutionality hearing. The purpose of offering that testimony, however, was to challenge the analog statute on the grounds of vagueness. Neither Reinhold nor Dr. Staubus opined that Pentedrone was not an analog of Methcathinone. In fact, they lacked *any* opinion about the identification of Pentedrone as an analog. The point of their proffered testimony was that the language of the analog statute was too vague to allow for such a determination. Yet, vagueness was not a question for the jury. Once the court determined as a matter of law that the analog statute was constitutional, the only question for the jury was the guilt or innocence of Appellants. To answer that question, the jury had to apply the analog statute and determine whether Pentedrone was or was not substantially similar to Methcathinone. Testimony aimed at showing that such a task was impossible would have been confusing or misleading to the jury. *See* Evid.R. 403(A). That testimony related to the constitutionality of the statute, not to whether the State had proven its case beyond a reasonable doubt.

{¶90} Although Appellants were not able to call their own experts at trial, they were able to fully cross-examine the State's experts. Both of the State's experts admitted on cross-examination that different scientists might apply the phrase "substantially similar" in different ways and, consequently, might reach different conclusions. Appellants were free to question the validity of their opinions based on those admissions. They were not free, however, to reexamine the issue of vagueness at trial by interjecting testimony aimed at attacking the constitutionality of the analog statute. Because Reinhold's and Dr. Staubus' testimony would have been confusing and/or misleading to the jury, the trial court did not abuse its discretion by excluding it. Hileman

and Hoover's third assignment of error, Jackson's fourth assignment of error, and DeArment's fourth assignment of error are overruled.

### HILEMAN & HOOVER'S ASSIGNMENT OF ERROR IV

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT TOOK JUDICIAL NOTICE OF TWO OF THE STATE'S EXHIBITS AND PRESENTED THEM TO THE JURY WITHOUT ANY QUALIFYING INSTRUCTION, MERITING REVERSAL.

### JACKSON'S ASSIGNMENT OF ERROR III

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT TOOK JUDICIAL NOTICE OF STATE'S EXHIBIT 2 WITHOUT ANY QUALIFYING INSTRUCTION, MERITING REVERSAL.

{¶91} In the foregoing assignments of error, Hileman, Hoover, and Jackson argue that the trial court erred by taking judicial notice of State's Exhibit 2 without giving the jury a proper qualifying instruction. Because they have forfeited the foregoing argument and have not asserted a claim of plain error on appeal, we reject their assignments of error.

{¶92} Under Evid.R. 201, a court may take judicial notice of an adjudicative fact when it is "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Evid.R. 201(B). The decision whether to take judicial notice of an adjudicative fact is a matter within the discretion of the trial court. *State v. Johnson*, 9th Dist. Summit No. 22688, 2006-Ohio-1313, ¶ 27. When a court takes judicial notice in a criminal case, the jury must be instructed "that it may, but is not required to, accept as conclusive any fact judicially noticed." Evid.R. 201(G).

{¶93} State's Exhibit 2 is a one-page document that purports to be a lab report from Research Triangle Park Laboratories, Inc. ("Research Triangle"). The lab report, dated March 6, 2012, is addressed to The Odd Corner and consists of an analysis performed on 5.1 grams of Joy.

It contains a list of various controlled substances that were "Not Detected" in the Joy sample and two substances that were detected: "Pentedrone 88% and Caffeine 12% * * *." The State sought to introduce the lab report in order to compare it to State's Exhibit 3, a Research Triangle lab report seized from the wall of The Odd Corner on the day the police executed their warrant. The two exhibits are identical in all respects but one: Exhibit 3 does not contain the one line of analysis indicating that the Joy sample contained "Pentedrone 88% and Caffeine 12% * * *."

{¶94} The State received Exhibit 2 from defense counsel during discovery, but was unable to find anyone at Research Triangle who was willing to authenticate the document.[4] The State asked the trial court to take judicial notice of its contents, strictly for purposes of comparing its contents to the contents of State's Exhibit 3. Because the exhibit came from defense counsel, the State argued that its accuracy could not reasonably be questioned. *See* Evid.R. 201(B)(2). Appellants opposed the State's request on the basis that the lab report amounted to unauthenticated hearsay. After multiple discussions outside the presence of the jury, the court stated that it would take judicial notice of the lab report and admitted State's Exhibit 2.

{¶95} Initially, we note that Hileman, Hoover, and Jackson have not presented this Court with an argument that Exhibit 2 was not an adjudicative fact of which the court could take judicial notice. Their argument is that the court erred in its instructions to the jury. Specifically, they argue that the trial court erred by taking judicial notice of State's Exhibit 2 in the absence of an instruction to the jury that it could, but was not required to, accept the lab report as conclusive. *See* Evid.R. 201(G). We limit our discussion accordingly.

---

[4] The State informed the court that it was Research Triangle's policy to only retain the records of any reports it produced for 30 days.

{¶96} It is not clear from the record that the court ever told the jury it was taking judicial notice of State's Exhibit 2. All of the conversations that the parties and the court had about the exhibit took place outside the presence of the jury, and all of the citations in Appellants' briefs refer to those discussions. Although the court told the parties that it would take judicial notice of the exhibit, Appellants have failed to point to any place in the record where the court actually instructed the jury to that effect. *See* 1980 Staff Notes to Evid.R. 201 ("Subdivisions (C), (D), (E), and (F), of [Evid.R. 201] * * * reflect the view that if a court takes judicial notice of an adjudicative fact, no countervailing evidence may be admitted to oppose the fact noticed *and the judge instructs the jury to find the fact judicially noticed*."). (Emphasis added.) Moreover, the record reflects that they failed to object on the basis that the court's jury instructions were incomplete.

{¶97} "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). If a defendant fails to object to the court's giving of an instruction or failure to give an instruction, he or she forfeits all but plain error on appeal. *See State v. Webb*, 9th Dist. Summit No. 27424, 2015-Ohio-2380, ¶ 26. Further, this Court will not undertake a plain error analysis when an appellant has failed to assert a claim of plain error. *See State v. Griffin*, 9th Dist. Lorain No. 11CA010128, 2013-Ohio-416, ¶ 39.

{¶98} To the extent Hileman, Hoover, and Jackson believe that the court's jury instructions were incomplete, it was their burden to raise that issue by making a timely objection. *See* Crim.R. 30(A). The record reflects that they failed to object on the basis that the court failed to issue an instruction under Evid.R. 201(G). *See* Evid.R. 201(G) (jury in criminal case must be

instructed that "it may, but is not required to, accept as conclusive any fact judicially noticed").

Likewise, they did not object on the basis that the court failed to instruct the jury that it was

taking judicial notice of the contents of State's Exhibit 2; a prerequisite to the issuance of the

corresponding instruction under Evid.R. 201(G). Because Hileman, Hoover, and Jackson failed

to preserve their objection(s), they are limited to a claim of plain error on appeal. Yet, they have

not argued plain error, and we will not undertake a plain error analysis on their behalf. *See*

*Griffin* at ¶ 39. Accordingly, Hileman and Hoover's fourth assignment of error and Jackson's

third assignment of error are overruled.

### HILEMAN & HOOVER'S ASSIGNMENT OF ERROR V

> THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT PENTEDRONE WAS A CONTROLLED SUBSTANCE ANALOG, AND THAT APPELLANTS HILEMAN AND HOOVER BELIEVED IT WAS A CONTROLLED SUBSTANCE THEREBY VIOLATING THEIR RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.

### JACKSON'S ASSIGNMENT OF ERROR VII

> THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT PENTEDRONE WAS AN ANALOG CONTROLLED SUBSTANCE, THEREBY VIOLATING JACKSON'S CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.

### DEARMENT'S ASSIGNMENT OF ERROR V

> DEARMENT'S CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE, AND MUST BE REVERSED.

**{¶99}** In each of the foregoing assignments of error, Appellants argue that their

respective convictions are based on insufficient evidence. Specifically, they argue that the State

failed to prove that Pentedrone has a substantially similar or greater effect on the central nervous

system as Methcathinone. Additionally, Hileman, Hoover, and DeArment argue that the State

failed to prove that they knowingly sold (Hileman and Hoover) or possessed (DeArment) a

controlled substance. We disagree.

{¶100} "Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 113, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The test for sufficiency requires a determination of whether the State has met its burden of production at trial." *State v. Edwards*, 9th Dist. Summit No. 25679, 2012-Ohio-901, ¶ 7.

**Substantially Similar Effect on the Central Nervous System**

{¶101} "A controlled substance analog, to the extent intended for human consumption, shall be treated for purposes of any provision of the Revised Code as a controlled substance in schedule I." Former R.C. 3719.013. For purposes of this appeal, the phrase "controlled substance analog" means a substance that has (1) a chemical structure that "is substantially similar to the structure of a controlled substance in schedule I"; and (2) "a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I * * *." R.C. 3719.01(HH)(1)(a), (b)(i). Methcathinone is a schedule I controlled substance. Former R.C. 3719.41(E)(4).

{¶102} Appellants argue that the State did not present sufficient evidence of Pentedrone's effect on the central nervous system. They argue that all of the State's evidence was anecdotal in

nature and did not establish beyond a reasonable doubt that Pentedrone had a substantially similar or greater pharmacological effect than Methcathinone.

{¶103} Dr. John Wyman testified that he is the chief toxicologist at the Cuyahoga County Medical Examiner's Office, holds a Ph.D. in Toxicology and Comparative Pharmacology, and is Board Certified in both General Toxicology and Forensic Toxicology. Prior to joining the Medical Examiner's Office in Cleveland, Dr. Wyman spent two years as the chief toxicologist in Dayton and seven years as the chief toxicologist in Columbus. Dr. Wyman explained that his office is responsible for helping the pathologist determine cause of death by detecting any drugs or chemicals that might be in the body and quantifying them to see if they are present in lethal levels. He testified that he became involved in the case at hand when the State asked him to use his knowledge and training as a forensic toxicologist to offer an opinion on the pharmacological effects of Pentedrone as compared to Methcathinone.

{¶104} Dr. Wyman testified that a pharmacological effect occurs when a drug binds to receptors in the body. He summarized that the location to which a drug binds, the manner in which it binds, and the strength with which it binds are all factors that will affect how the drug and the receptors in the body interact. According to Dr. Wyman, Methcathinone causes a pharmacological effect because it binds to dopamine and serotonin neurotransmitters in the body and prevents their reuptake. The effect of the drug is similar to that of methamphetamine and cocaine in that it increases feelings of euphoria, alertness, empathy, and sense of communication. Negative side effects of the drug include appetite and thirst suppression, hypertension, an elevated heart rate, and a loss of cognitive ability. Dr. Wyman testified that Methcathinone is a schedule I controlled substance because it has no medical value and a high potential for abuse.

{¶105} Dr. Wyman described the chemical structure of Methcathinone and noted that it was almost identical to two other structures: Buphedrone and Pentedrone. He explained that Buphedrone is made by adding a methyl group (one carbon) to Methcathinone and Pentedrone is made by adding an ethyl group (two carbons) to Methcathinone. According to Dr. Wyman, Buphedrone has been shown to have pharmacological effects similar to Methcathinone. Specifically, it has been shown to increase feelings of euphoria, alertness, empathy, and sense of communication while also increasing heart rate and decreasing the user's appetite and thirst. Dr. Wyman admitted that Pentedrone was too new for there to have been any pharmacological studies performed on it, but predicted within a reasonable degree of scientific certainty that Pentedrone would have a substantially similar or greater pharmacological effect than Methcathinone. He emphasized that Pentedrone and Buphedrone only differ by one carbon atom and Buphedrone has been shown to have effects similar to Methcathinone. Additionally, Dr. Wyman testified that both Methcathinone and Pentedrone were substitute Cathinones and shared the same Cathinone backbone. He stated that it was common practice in his field, when confronted with a new designer drug, to compare the chemical structure of the new drug with that of a known controlled substance for purposes of forming an opinion about the pharmacological effect of the new drug.

{¶106} Dr. Wyman testified that his comparison of the chemical structures of Pentedrone and Methcathinone, in conjunction with his training and experience, allowed him to conclude that Pentedrone's effect on the central nervous system would be substantially similar to or greater than Methcathinone's effect. He opined that the ethyl group in Pentedrone would simply increase the molecule's solubility in fat and, therefore, would most likely increase its binding affinity at the receptor site. He offered multiple examples in support of his theory and explained

that molecules with greater fat solubility have an easier time crossing cell membranes so they result in a quicker effect.

{¶107} At trial, the State also introduced the testimony of three individuals, all of whom admitted that they had purchased Joy at The Odd Corner in March 2012. Gary Mills testified that he had been using bath salts for about a year when the police arrested him in conjunction with his purchase of Joy at The Odd Corner. Mills indicated that, in addition to Joy, he had used at least three other types of bath salts and had watched people use bath salts on "[t]housands of occasions." He testified that bath salts gave him a "very euphoric feeling" as well as an abundance of energy. According to Mills, a quarter to a half gram of bath salts would allow an average individual to stay awake for three or four days. He testified that the feeling he got from using Joy was not as intense as the feeling he got from some of the other bath salts he had tried, but that Joy had the same overall effect as other bath salts and satisfied his habit.

{¶108} William Kimble testified that he began using bath salts in the spring of 2011 and purchased Joy from The Odd Corner on March 21, 2012. At the time, Kimble used bath salts almost every day. He testified that he learned from several friends that The Odd Corner was selling Joy. When the police stopped Kimble on March 21st, he had already used Joy from The Odd Corner on at least one occasion. He testified that Joy "was like really strong cocaine" and gave him "a speed buzz." According to Kimble, the effects he felt from Joy were comparable to the effects he had felt from other bath salts on prior occasions.

{¶109} Eric Hinman testified that he had used Joy five to six times a month for a period of two months when the police stopped him in connection with the warrant they executed at The Odd Corner on March 23, 2012. He testified that he had been a drug user for about four years at that point and primarily used heroin and crack cocaine. According to Hinman, Joy made him

"really energetic, like a cocaine buzz, crack buzz," but also caused him to hallucinate and suffer from paranoia. He testified that he purchased Joy specifically from The Odd Corner on at least four or five occasions.

{¶110} Viewing all of the evidence in a light most favorable to the prosecution, we must conclude that the State set forth evidence from which a rational trier of fact could have concluded that Pentedrone's effect on the central nervous system is substantially similar to or greater than Methcathinone's effect. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The State could not produce direct evidence to that effect because, at the time of trial, no pharmacological studies about the effects of Pentedrone existed. It is well established, however, that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *Id.* at paragraph one of the syllabus. The testimony outlined above constituted circumstantial evidence of Pentedrone's pharmacological effect. Dr. Wyman was able to draw on his extensive training and knowledge in his field to predict the effect of Pentedrone, based on its chemical structure and the known effects of other chemicals whose structures were virtually identical. He specifically opined that Pentedrone would have a pharmacological effect on the central nervous system that was substantially similar to or greater than the effect of Methcathinone. Additionally, the State introduced the testimony of three individuals who had ingested Joy after they purchased it from the Odd Corner. Their testimony, by itself, could not establish the pharmacological effect prong of the analog statute because there was no evidence about the chemical composition of the other bath salts or drugs that they were comparing to Joy. Nevertheless, they were all able to describe in general terms the effects they felt after having ingested the Joy they purchased from The Odd Corner. The effects they described mirrored the effects that Dr. Wyman predicted Pentedrone would cause upon ingestion. To the extent

Appellants' cast the State's evidence as unreliable, their argument sounds in weight rather than sufficiency. *See State v. Browning*, 9th Dist. Summit No. 26687, 2013-Ohio-2787, ¶ 8. The record supports the conclusion that the State satisfied its burden of production on the element of pharmacological effect. As such, Appellants' arguments to the contrary lack merit.

{¶111} DeArment's brief also contains a blanket statement that the State failed to prove that Pentedrone's chemical structure is substantially similar to Methcathinone's chemical structure. In analyzing whether a drug constitutes an analog of a controlled substance, the chemical structure element is distinct from the pharmacological element. *See* R.C. 3719.01(HH)(1). This Court will not engage in a sufficiency analysis on the chemical structure element of the statute when DeArment has not done so. It is an appellant's burden to "set[] forth an argument on appeal and point[] this [C]ourt to applicable, legal authority in support of that argument." *State v. Raber*, 189 Ohio App.3d 396, 2010-Ohio-4066, ¶ 30 (9th Dist.). Because DeArment has not satisfied his burden, we will not address his blanket statement that the State failed to prove the chemical structure element. *See Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) ("If an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out.").

**Knowingly Trafficking in or Having Possession of a Controlled Substance**

{¶112} Under Former R.C. 2925.03(A)(1), "[n]o person shall knowingly * * * [s]ell or offer to sell a controlled substance * * *." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." Former R.C. 2901.22(B). If the drug involved in the sale or offer of sale under Former R.C. 2925.03(A)(1) is "any compound, mixture, preparation, or substance

included in schedule I," the violation of the statute constitutes aggravated trafficking. Former R.C. 2925.03(C)(1). *See also* Former R.C. 3719.013 (controlled substance analog to be treated as schedule I controlled substance if intended for human consumption).

{¶113} Under Former R.C. 2925.11(A), "[n]o person shall knowingly obtain, possess, or use a controlled substance * * *." "'[P]ossession' means having control over a thing or substance." R.C. 2925.01(K). If the drug being obtained, possessed, or used under Former R.C. 2925.11(A) is "a compound, mixture, preparation, or substance included in schedule I," the violation of the statute constitutes aggravated possession. Former R.C. 2925.11(C)(1). *See also* Former R.C. 3719.013 (controlled substance analog to be treated as schedule I controlled substance if intended for human consumption).

{¶114} Hileman, Hoover, and DeArment argue that there was insufficient evidence of their culpability because, at the time they either sold or possessed Joy, they believed it to be a legal substance. Because it was the State's burden to prove that they knowingly sold or possessed a controlled substance, they argue that their respective convictions are based on insufficient evidence.

{¶115} Detective Angela Paonessa, a detective with the University of Akron Police Department, testified that her department began investigating The Odd Corner after the Akron Police Department's Vice Unit provided them with intelligence that Joy bath salts were being sold there. Detective Paonessa went to the store on March 21, 2012, for the purpose of conducting a controlled buy. Dressed in plain clothes, Detective Paonessa entered the store around 5:00 p.m. while other officers waited outside and monitored her progress via a wire. She identified Hoover as the employee who was working at the store when she entered it. While Detective Paonessa walked around the store, she observed a couple approach the counter and ask

Hoover for Joy. Hoover entered the back room, returned with an orange container of Joy, and sold it to the man and woman.

{¶116} Detective Paonessa stepped into line behind the man and woman as they were purchasing the Joy. Once they left, she too approached the counter and asked Hoover for Joy. Hoover entered the back room, came out with an orange container of Joy, and told Detective Paonessa that the cost was $36.20. Detective Paonessa then asked Hoover if she could purchase K2,[5] but he responded that the owner of The Odd Corner "doesn't want to mess with that" because it was not possible to "really control what they're putting in that stuff." Nevertheless, Hoover informed Detective Paonessa that she could purchase K2 at a particular store in Canton if she went there and asked for "Mad Monkey." When Detective Paonessa asked Hoover if the Joy she bought was "good," he responded affirmatively and stated that he "could open a store just selling [it]" because he could not "keep it on the shelves."

{¶117} Detective Paonessa testified that she secured a warrant for The Odd Corner the following day and came to the store on the morning of March 23, 2012, to execute the warrant. She arrived approximately one and a half hours before the store was scheduled to open so that she could conduct surveillance. She testified that the store was set to open at 11:00 a.m., but cars began pulling into the parking lot at about 10:40 a.m. One of those cars belonged to DeArment, who waited in this car alongside the other customers who arrived early.

{¶118} At approximately 11:15 a.m., Hileman arrived and opened the store. Detective Paonessa testified that, as soon as Hileman opened the door to her car, the people who had been waiting in the parking lot got out of their cars. She agreed that it was her impression that the people waiting in their cars recognized Hileman. She testified that the group went inside the

[5] K2 is also referred to as spice and is another drug of abuse.

store with Hileman and, approximately two minutes later, people started coming out. Detective Paonessa radioed other officers to follow the people leaving the store and continued her surveillance for another half an hour before executing the warrant.

{¶119} Detective Paonessa testified that the search of The Odd Corner uncovered numerous items, including almost 100 containers of Joy, over $3,000 in cash, and register tapes spanning from October 2011 up to the day of the search. As part of her investigation, Detective Paonessa reviewed all of the register tapes and The Odd Corner's bank records. She discovered that the cash register at the store had a button labeled "Joy," which, when pressed, rang up as a sale for a "t-shirt" at a price of $36.20, including tax. Using the register tapes, Detective Paonessa compiled a spreadsheet of the sales of Joy from October 19, 2011, to March 23, 2012. Her spreadsheet reflected the following sales: (1) from October 19, 2011, to October 31, 2011, 66 units of Joy were sold for a total of $3,299.34, not including tax; (2) from November 1, 2011, to November 30, 2011, 76 units of Joy were sold for a total of $3,799.24, not including tax; (3) from December 1, 2011, to December 31, 2011, 76 units of Joy were sold for a total of $3,799.24, not including tax; (4) from January 1, 2012, to January 23, 2012, 238 units of Joy were sold for a total of $6,322.14, not including tax; (4) from February 2, 2012, to February 29, 2012, 359 units of Joy were sold for a total of $12,202.41, not including tax; and (5) from March 1, 2012, to March 23, 2012, 977 units of Joy were sold for a total of $33,208.23, not including tax. Thus, from October 19, 2011, to March 23, 2012, The Odd Corner sold $62,630.60 worth of Joy, not including the tax on those sales. Over half of that amount came from the sales that took place during the first three weeks of March 2012.

{¶120} Detective Paonessa testified that she spoke with Hileman after her arrest and Hileman indicated that she was the manager of The Odd Corner. Hileman described Joy as "a

novelty item" and said that she did not know what its purpose was. When Detective Paonessa asked Hileman whether she cared that Joy was making people sick she responded: "I don't know what people do with it. They're adults." Nevertheless, Hileman admitted that she once received a call from a mother who was upset that the store had sold Joy to her son. Hileman told Detective Paonessa that she refused to sell Joy to him the next time he came into the store.

{¶121} Hileman informed Detective Paonessa that The Odd Corner purchased Joy from a company in Indiana whose contact person was a man named William Wetzel. In reviewing The Odd Corner's bank statements, Detective Paonessa uncovered numerous checks written to Wetzel, which were signed by either Hileman or Jackson. From October 29, 2011 to March 16, 2012, The Odd Corner purchased 2100 units of Joy from Wetzel at a total cost of $16,800. Accordingly, the store purchased Joy at a cost of $8 per unit and sold it at a price of $36.20 per unit. Hileman told Detective Paonessa that Jackson was generally responsible for calling Indiana to order more Joy and placed orders approximately one to two times per week.

{¶122} Officer Lawrence Kouri testified that he assisted in the execution of Detective Paonessa's search warrant on March 23, 2012. After receiving a radio call from Detective Paonessa, Officer Kouri began following a dark-colored Mazda that was leaving The Odd Corner parking lot. The Mazda was one of the vehicles that Detective Paonessa had observed at the store at approximately 10:40 a.m. Officer Kouri later stopped the Mazda and spoke to the driver, DeArment. DeArment admitted that he had come from The Odd Corner and had purchased Joy. Officer Kouri confiscated one container of Joy from DeArment, and Detective Jason Hill arrived on scene. Detective Hill testified that DeArment admitted he had purchased Joy, but claimed to have purchased it for a female whose identity he would not disclose. DeArment informed

Detective Hill that he had driven 50 miles from Wooster to come to The Odd Corner and was headed back to Wooster when Officer Kouri stopped him.

{¶123} Each container of Joy from The Odd Corner was small, plastic, and orange. There was testimony that the containers were stored in a back room near the cash register so that they were not visible to the general public. Each container had the word "Joy" stamped on its lid along with the words "Not for Human Consumption." Inside each plastic container was a baggie containing approximately .5 grams of white powder. There is no dispute that the samples of Joy taken from The Odd Corner and DeArment and tested at BCI all tested positive for the presence of Pentedrone.

{¶124} Captain Brian Taylor testified that he was on scene at The Odd Corner on March 23, 2012, to aid in the execution of the search warrant. During the search, he discovered a paper publicly displayed on the wall behind the cash register. The paper, dated March 6, 2012, and labeled State's Exhibit 3, consisted of a lab analysis report from Research Triangle, detailing the analysis the lab had performed on a 5.1 gram sample of Joy. State's Exhibit 3 contained a long list of illegal substances that were "Not Detected" in Joy. Through Detective Paonessa, however, the State also introduced State's Exhibit 2. State's Exhibit 2 consisted of a virtually identical lab analysis report from Research Triangle. The only difference between the two exhibits was that State's Exhibit 2 contained one additional line of lab analysis, indicating that Joy contained "Pentedrone 88% and Caffeine 12% * * *." State's Exhibit 2 was not placed on display in the store.

{¶125} Viewing all of the evidence in a light most favorable to the prosecution, we must conclude that the State set forth evidence from which a rational trier of fact could have concluded that Hileman, Hoover, and DeArment knowingly sold or possessed a controlled

substance (Pentedrone) rather than a substance that they believed to be legal. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. Despite its immense popularity, the Joy that was for sale at The Odd Corner was kept in a back room such that it was not on display to the general public and had to be asked for by name. Each small container of Joy cost $36.20 and was labeled with the words "Not for Human Consumption." One could infer that the language on each container harkened back to the statutory requirement that controlled substance analogs be "intended for human consumption." *See* R.C. 3719.013. Moreover, one could draw conclusions about the culpability of those involved based on the fact that the cash register at The Odd Corner had a specific button for Joy sales, but rung up the sales as sales of t-shirts.

{¶126} With respect to Hileman, there was evidence that she repeatedly signed checks for the purchase of large amounts of Joy at a modest cost before reselling it to customers of The Odd Corner at a substantial mark-up. There was evidence that the store sold an astronomical 977 containers of Joy in the first three weeks of March alone and that people crowded the parking lot in the morning waiting for the store to open. Detective Paonessa observed a crowd follow Hileman into the store and emerge quickly thereafter, having strictly purchased Joy. Hileman herself admitted that she had once received a phone call from an angry mother whose son became sick from the Joy the store had sold him.

{¶127} With respect to Hoover, there was evidence that he told Detective Paonessa that he "could open a store just selling [Joy]" because he could not "keep it on the shelves." Detective Paonessa witnessed Hoover sell Joy multiple times during the short time that she was at the store to make the controlled buy.

{¶128} With respect to DeArment, there was evidence that he drove 50 miles one way just to purchase Joy from The Odd Corner. He arrived at the store approximately 20 minutes

before it even opened and waited in the parking lot until Hileman arrived. Once he successfully purchased Joy, DeArment left immediately to return to Wooster. Moreover, while he claimed to have purchased Joy for someone else, he refused to disclose her identity.

{¶129} As previously noted, "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." Former R.C. 2901.22(B). Based on the evidence outlined above, a rational trier of fact could have concluded that Hileman, Hoover, and DeArment knowingly sold or purchased a controlled substance (Pentedrone) rather than a legal one. As such, their argument lacks merit. Hileman and Hoover's fifth assignment of error, Jackson's seventh assignment of error, and DeArment's fifth assignment of error are overruled.

### HILEMAN & HOOVER'S ASSIGNMENT OF ERROR VI

THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE EVIDENCE RELIED UPON BY THE STATE TO PROVE THE EFFECT OF PENTEDRONE ON THE CENTRAL NERVOUS SYSTEM WAS UNRELIABLE AND THE CIRCUMSTANCES OF THE SALES DID NOT SHOW INTENT TO SELL A CONTROLLED SUBSTANCE.

### JACKSON'S ASSIGNMENT OF ERROR VIII

THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE EVIDENCE RELIED UPON BY THE STATE TO PROVE THE EFFECT OF PENTEDRONE ON THE CENTRAL NERVOUS SYSTEM WAS UNRELIABLE.

### DEARMENT'S ASSIGNMENT OF ERROR VI

DEARMENT'S CONVICTION IS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE, AND SO HIS CONVICTION MUST BE REVERSED AND HIS CASE REMANDED FOR A NEW TRIAL.

{¶130} In each of the foregoing assignments of error, Appellants argue that their respective convictions are against the manifest weight of the evidence. Specifically, they argue

that the State produced unreliable evidence in support of its contention that Pentedrone's pharmacological effect is substantially similar to or greater than Methcathinone's effect. Additionally, Hileman, Hoover, and DeArment argue that the jury lost its way when it concluded that they knowingly sold (Hileman and Hoover) or possessed (DeArment) a controlled substance. We do not agree that Appellants' convictions are against the weight of the evidence.

{¶131} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction. *Thompkins*, 78 Ohio St.3d at 387. *Accord Otten* at 340.

{¶132} Appellants did not present any witnesses in their defense. Instead, they relied upon extensive cross-examination of the State's witnesses. In the foregoing assignments of error, they ask this Court to review for manifest weight the same arguments that they previously made in support of their challenge to the sufficiency of the evidence.

{¶133} To the extent Appellants challenge the State's evidence about the pharmacological effects of Pentedrone, we note that the jury was in the best position to judge the

credibility of Dr. Wyman and the three individuals who described the effects they felt after using Joy. *See State v. Prade*, 9th Dist. Summit No. 26775, 2014-Ohio-1035, ¶ 128 ("[W]itness and expert credibility determinations as well as the proper weight to afford those determinations fall squarely within the province of the trier of fact."). Dr. Wyman explained, in detail, how he was able to form an opinion about the pharmacological effects of Pentedrone based on his education, training, and knowledge of toxicology and pharmacology in conjunction with his review of the structural relationship of Pentedrone to other molecules that it closely resembled. He testified in depth about the known pharmacological effects of Methcathinone and Buphedrone. Additionally, he testified about the effects of ethyl groups and their tendency to simply increase the fat solubility of molecules. Dr. Wyman readily acknowledged that no pharmacological studies were yet available on Pentedrone, but he gave numerous examples in support of his conclusion and drew upon a considerable amount of experience. Likewise, the three individuals who testified that they had ingested Joy and were able to testify about the effects they felt after ingesting Joy. All three described having experienced effects that matched the effects that Dr. Wyman predicted Pentedrone would cause. Thus, the jury reasonably could have concluded that Dr. Wyman was correct in his opinion about the pharmacological effects of Pentedrone and that the effects the three individuals felt were due to the Pentedrone in Joy. After a thorough review of the record, we cannot conclude that the jury lost its way and committed a manifest miscarriage of justice when it concluded that Pentedrone's effect on the central nervous system was substantially similar to or greater than Methcathinone's effect.

{¶134} Hileman, Hoover, and DeArment also argue that the jury lost its way when it concluded that they knowingly sold or possessed a controlled substance. There was a wealth of circumstantial evidence, however, tending to show that they acted with the requisite degree of

culpability. As previously noted, Joy sales became an extremely lucrative endeavor for The Odd Corner. The store sold over $33,000 worth of Joy in March 2012 alone, but made no visible effort to advertise the product. Indeed, the store kept the containers of Joy in a back room such that customers had to ask for Joy by name. There was testimony that people arrived at the store well before it opened and waited in the parking lot so that they could buy Joy at the first available opportunity. DeArment, in particular, drove 50 miles one way just to purchase Joy, and there was evidence that The Odd Corner had many repeat customers who bought Joy. The store charged customers approximately four and a half times more for each container of Joy than it had paid to purchase it. Moreover, each sale was charged as the sale of a t-shirt. There was no evidence that any customers were provided with a receipt for their purchase and, because the purchase was documented as one for a t-shirt, none of The Odd Corner's cash register tapes even reflected that Joy had ever been sold there.

{¶135} This Court has carefully reviewed all of the evidence in the record. Although Hileman, Hoover, and DeArment claimed not to have known that Joy contained an illegal substance, we are unable to conclude that this is the exceptional case where the jury lost its way by convicting them. *See Otten*, 33 Ohio App.3d at 340. As such, their respective convictions are not against the manifest weight of the evidence. Hileman and Hoover's sixth assignment of error, Jackson's eighth assignment of error, and DeArment's sixth assignment of error are overruled.

## HILEMAN'S ASSIGNMENT OF ERROR VII

THE TRIAL COURT ERRED IN APPLYING THE BULK AMOUNT DEFINITION OF R.C. 2925.01(1) TO APPELLATE (sic) HILEMAN AS THE SECTION DID NOT INCLUDE PENTEDRONE NOR A CONTROLLED SUBSTANCE ANALOG.

**JACKSON'S ASSIGNMENT OF ERROR V**

THE TRIAL COURT ERRED IN APPLYING THE BULK AMOUNT DEFINITION OF R.C. 2925.01(1) AS THE SECTION DID NOT INCLUDE PENTEDRONE NOR A CONTROLLED SUBSTANCE ANALOG.

{¶136} In the foregoing assignments of error, Hileman and Jackson argue that the trial court erred by using the definition contained in Former R.C. 2925.01(D)(1)(c) to define "bulk amount" for the jury. According to Hileman and Jackson, the Revised Code did not contain a definition for the bulk amount of a controlled substance analog at the time of their respective offenses. Consequently, they argue that they could not have been convicted of second-degree felonies for selling or possessing a bulk amount of Pentedrone.

{¶137} "An appellate court's review of the interpretation and application of a statute is de novo." *Akron v. Frazier*, 142 Ohio App.3d 718, 721 (9th Dist.2001). "A de novo review requires an independent review of the trial court's decision without any deference to the trial court's determination." *State v. Consilio*, 9th Dist. Summit No. 22761, 2006-Ohio-649, ¶ 4.

{¶138} Hileman and Jackson were convicted of second degree felonies with respect to their convictions for aggravated trafficking and aggravated possession. The offenses were second-degree felonies rather than fourth-degree felonies because "the amount of the drug involved equal[ed] or exceed[ed] five times the bulk amount but [was] less than fifty times the bulk amount." Former R.C. 2925.03(C)(1)(d); Former R.C. 2925.11(C)(1)(c). The question is how the legislature defined "bulk amount" for purposes of a controlled substance analog at the time that Hileman and Jackson committed their offenses.

{¶139} R.C. 2925.01(D) sets forth the definition of "bulk amount" for a variety of controlled substances. Certain controlled substances are not included within the subdivision, however, because the enhancements associated with those substances are governed by other

statutory provisions. For instance, Former R.C. 2925.01(D)(1) did not provide bulk amount definitions for marijuana, cocaine, L.S.D., heroin or hashish. *See* Former R.C. 2925.01(D)(1). Instead, the trafficking and possession statutes contained their own provisions for those substances, outlining the enhancements associated with selling or possessing certain amounts of them. *See* Former R.C. 2925.03(C)(3)-(7); Former R.C. 2925.11(C)(3)-(7). During the timeframe relevant to this appeal, the trafficking and possession statutes did not contain any provisions that outlined enhancements for selling or possessing certain amounts of controlled substance analogs. Accordingly, the bulk amount definition contained within Former R.C. 2925.01(D) controlled.

{¶140} Former R.C. 2925.01(D)(1)(c) provided that for "any compound, mixture, preparation, or substance included in schedule I" a "bulk amount" of the drug consisted of "[a]n amount equal to or exceeding thirty grams or ten unit doses of a [drug] * * * that is or contains any amount of a schedule I hallucinogen * * * or a schedule I stimulant or depressant * * *." Former R.C. 2925.01(D)(1)(c). Hileman and Jackson argue that the foregoing subsection did not apply to them because analogs are not schedule I hallucinogens, stimulants, or depressants. They argue that Former R.C. 3719.41 set forth the five types of schedule I controlled substances, three of which were hallucinogens, stimulants, and depressants. *See* Former R.C. 3719.41. According to Hileman and Jackson, Former R.C. 2925.01(D)(1)(c) only provided the bulk amount definition for the substances that appeared within Former R.C. 3719.41's list of schedule I hallucinogens, stimulants, or depressants. Because neither Pentedrone, nor controlled substance analogs appeared on Former R.C. 3719.41's list of schedule I hallucinogens, stimulants, or depressants, they argue that the trial court erred by relying on the bulk amount definition contained in Former R.C. 2925.01(D)(1)(c). According to Hileman and Jackson, the Revised Code did not contain a

bulk amount definition for Pentedrone or controlled substance analogs at the time they committed their respective offenses.

**{¶141}** "[S]ections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." R.C. 2901.04(A). Yet, "[t]he canon in favor of strict construction of criminal statutes is not an obstinate rule which overrides common sense and evident statutory purpose. The canon is satisfied if the statutory language is given fair meaning in accord with the manifest intent of the General Assembly." *State v. Sway*, 15 Ohio St.3d 112, 116 (1984).

**{¶142}** As previously noted, controlled substance analogs that are intended for human consumption "shall be treated for purposes of any provision of the Revised Code as a controlled substance in schedule I." Former R.C. 3719.013. The State prosecuted Appellants under the theory that Pentedrone is an analog of Methcathinone, and there is no dispute that Former R.C. 3719.41 listed Methcathinone as a schedule I stimulant. Former R.C. 3719.41(E)(4). Because Former R.C. 3719.013 required Pentedrone to be treated as Methcathinone "for purposes of any provision of the Revised Code," it was appropriate for the trial court to treat Pentedrone as it would treat Methcathinone when determining the issue of bulk amount. Former R.C. 2925.01(D)(1)(c) provided the bulk amount definition for Methcathinone. As such, the court did not err when it concluded that the same subsection provided the bulk amount definition for Pentedrone. We reject Hileman and Jackson's argument to the contrary. Consequently, Hileman's seventh assignment of error and Jackson's fifth assignment of error are overruled.

### JACKSON'S ASSIGNMENT OF ERROR VI

THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT APPELLANT'S CONVICTIONS FOR POSSESSING FIVE TIMES THE BULK AMOUNT OF A CONTROLLED SUBSTANCE ANALOG.

**{¶143}** In his sixth assignment of error, Jackson argues that his second-degree felony convictions for aggravated trafficking and aggravated possession are based on insufficient evidence because the State failed to prove that he sold or possessed a bulk amount of Pentedrone. We disagree.

**{¶144}** "Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern." *Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, at ¶ 113, citing *Thompkins*, 78 Ohio St.3d at 386.

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. "The test for sufficiency requires a determination of whether the State has met its burden of production at trial." *Edwards*, 2012-Ohio-901, at ¶ 7.

**{¶145}** The jury found Jackson guilty of possessing and trafficking in an amount of Pentedrone that "equal[ed] or exceed[ed] five times the bulk amount but [was] less than fifty times the bulk amount." Former R.C. 2925.03(C)(1)(d); Former R.C. 2925.11(C)(1)(c). At the time Jackson committed his offenses, a "bulk amount" of Pentedrone was "[a]n amount equal to or exceeding thirty grams or ten unit doses" of the drug. Former R.C. 2925.01(D)(1)(c). A "unit dose" is "an amount or unit of a compound, mixture, or preparation containing a controlled substance that is separately identifiable and in a form that indicates that it is the amount or unit by which the controlled substance is separately administered to or taken by an individual." Former R.C. 2925.01(E). Accordingly, to convict Jackson of second-degree felonies based on

unit dose, the State had to prove that he trafficked in and possessed between 50 and 500 unit doses of Pentedrone.

{¶146} Anna Tabor, a forensic scientist in BCI's chemistry section, testified that the police sent her 101 containers of Joy for testing. One container was purchased by Detective Paonessa when she conducted her controlled buy at The Odd Corner. The police confiscated the second container from DeArment and the third container from a man named Eric Hinman on the day they executed their warrant at The Odd Corner. They found the remaining 98 containers of Joy in the back room at The Odd Corner. There was testimony that the police removed one of the 98 containers for field testing and then shipped the one container they removed along with the remaining 97 containers to BCI for testing.

{¶147} Tabor testified that she actually tested a total of five containers of Joy: one container from the package of 97, the one container that the police field tested, and the three containers from Detective Paonessa, DeArment, and Hinman. According to Tabor, BCI generally abides by a sampling plan known as hypergeometric sampling when they receive multiple samples to test from the same source. She admitted, however, that she did not perform hypergeometric sampling on the package of 97 containers she received for testing. Instead, she received approval from her supervisors to test only one of the 97 containers. According to Tabor, her supervisors felt it was unnecessary to perform hypergeometric sampling on the 97 containers due to the nature of the population and the link between the 97 containers and the other four containers the police seized. She testified that the 97 containers were all "little plastic boxes" that were labeled "Joy" and were all packaged and sealed in the same fashion.

{¶148} Because she did not test each of the 97 containers seized directly from The Odd Corner or take a hypergeometric sampling of those containers, Tabor admitted that she could not

say within a reasonable degree of scientific certainty whether all of those containers contained Pentedrone. She testified, however, that each of the five containers of Joy she tested (of the original 101 submitted to her) held a white powder that tested positive for Pentedrone and caffeine. Per BCI's policy, Tabor did not attempt to quantify the amount of Pentedrone that was present in each of the five containers. Nevertheless, she testified, to a reasonable degree of scientific certainty, that all five containers of Joy contained Pentedrone.

{¶149} Jackson argues that his second-degree felony convictions for aggravated trafficking and aggravated possession are based on insufficient evidence because the State failed to prove bulk amount. As previously noted, Tabor only tested five of the Joy containers she received. Because Tabor admitted that she did not test the remaining 96 containers and did not perform hypergeometric sampling on them, Jackson argues that the jury could not infer that any of them contained Pentedrone.

{¶150} "This Court has previously held that a scientific analysis of a random sampling of pills from a bulk quantity is sufficient to support an inference that all of the pills contain the same drug, if the defendant offers no rebuttal." *State v. Mathis*, 9th Dist. Summit No. 23507, 2007-Ohio-2345, ¶ 12. *Accord State v. Rush*, 9th Dist. Lorain Nos. 3809 & 3818, 1985 WL 11030, *4 (July 31, 1985) ("Chemical analysis of a random sample of a quantity of drugs is enough to allow a reasonable inference that all of the tablets contained the same drug * * *, if no rebuttal is offered."). "We have never set requirements on the percentage of a substance that must be analyzed to support such an inference, as it depends on the facts and circumstances of each case." *State v. Garnett*, 9th Dist. Medina No. 12CA0088-M, 2013-Ohio-4971, ¶ 7.

{¶151} In *Garnett*, the police seized 49 pills from Garnett and charged him with trafficking in a bulk amount of oxycodone. *Id.* at ¶ 2. BCI only tested one of the 49 pills to

confirm the presence of oxycodone and, on appeal, Garnett argued that the State was required to test a larger sampling of the pills to support the inference that they all contained oxycodone. *Id.* at ¶ 6. We rejected his argument and held that "where the seized pills were bundled together, were uniform in color, shape, size, and marking, and were of 'pharmaceutical grade,' * * * the random selection and sampling of only one of the pills was sufficient to support an inference that all of the pills contained oxycodone." *Id.* at ¶ 7. We conclude that the same rationale applies in the instant appeal.

**{¶152}** There was testimony at trial that all 101 containers of Joy that the State submitted to BCI came from The Odd Corner. All of the containers were identical, small orange containers stamped with the word "Joy," and each of the five containers Tabor tested contained a white powder that tested positive for Pentedrone and caffeine. The 98 containers that the police seized directly from the back room of The Odd Corner were all initially packaged together. The police removed one for field testing, and Tabor later removed another to test. There was no evidence that any of the remaining 96 containers had a different appearance. Further, there was no evidence that any of the actual testing Tabor performed was unreliable. *See Garnett* at ¶ 7, quoting *State v. Reynolds*, 4th Dist. Ross No. 1185, 1985 WL 3854, *2 (Sept. 26, 1985 (Grey, J., concurring) ("[I]f [an] appellant wishes to object to the evidence on the grounds that it is not random or representative, it is incumbent upon him to introduce by expert witness or otherwise sufficient evidence to show the unreliability of the testing."). Based on the foregoing facts and circumstances, "we conclude that the random selection and sampling of only one of the [97 containers of Joy] was sufficient to support an inference that all of the [remaining 96 containers] contained [Pentedrone]." *Garnett* at ¶ 7.

{¶153} Viewing the evidence in a light most favorable to the State, we must conclude that there was evidence from which a rational trier of fact could have concluded that the State proved that Jackson trafficked in and possessed a bulk amount of Pentedrone. The jury could infer that all 101 containers of Joy that the police seized contained Pentedrone. Further, the jury reasonably could have concluded that each container of Joy contained a unit dose of Pentedrone. *See* Former R.C. 2925.01(E) ("unit dose" defined). Because the State set forth sufficient evidence that Jackson trafficked in or possessed between 50 and 150 unit doses of Pentedrone, we reject his argument that the State failed to prove bulk amount. Consequently, his sixth assignment of error is overruled.

III.

{¶154} Appellants' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
WHITMORE, J.
CONCUR.

APPEARANCES:

KIRK A. MIGDAL, Attorney at Law, for Appellant.

J. DEAN CARRO, Attorney at Law, for Appellants.

JACQUENETTE S. CORGAN, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.